UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PHILIP READ,<br><br>        Plaintiff,<br><br>v.<br><br>PAUL PROFETA; PAUL V. PROFETA & ASSOCIATES; RADIUS: BRICK CITY & BEYOND; STEVEN COLEMAN; and WILLIAM KOHN,<br><br>        Defendants. | Civ. No. 15-cv-2637 (KM)<br><br>OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

  The plaintiff, Philip Read, formerly of *The Star-Ledger,* had an idea for a Newark-based magazine called *The Downtowner.* He pitched the idea to defendant Paul Profeta. Read alleges that he met with local community leaders and funding sources and put together a prototype, from time to time meeting with Profeta and others at Profeta's firm to develop plans for the content and the business model of the new magazine. Read alleges that at some point Profeta withdrew from their discussions, and shortly thereafter began publishing his own version of the magazine, called *Radius: Brick City & Beyond.* Read alleges fifteen[1] state-law causes of action against Profeta and his associates.

  Now before the Court is defendants' motion to dismiss the complaint for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated herein, the motions will be granted in part, but for the most part denied. The Complaint alleges facts which, if proven, might make out a claim. Of course, alleging is one thing; proving, another.

---

[1]   Although the counts are numbered 1 through 18, there is no Count 8, Count 16, or Count 17.

1

## I. THE COMPLAINT

The allegations of the Complaint, considered true for purposes of this motion only, are as follows.

The plaintiff, Philip Read, was a reporter for the *The Star-Ledger* in Newark until late 2010. He is now a citizen of North Carolina. Defendant Paul V. Profeta is a business figure known for his interest in the revitalization of Newark. His firm, Paul V. Profeta & Associates ("Associates"), based in West Orange, invests in and manages real estate. Defendant Steven Coleman is CFO, and defendant William Kohn is legal counsel, for Associates. Jurisdiction is premised on diversity of citizenship. *See* 28 U.S.C. § 1332.

Read met Profeta in 2010 when reporting a story that involved Profeta's Urban Development Institute, which provided no-interest loans to minority businesses in the Newark area. (Cplt. ¶¶ 10–13) In November 2010, Read told Profeta about his "vision" for a magazine called *The Downtowner*. Read's "pitch was this: *The Star-Ledger's* diminished resources would mean that its small staff would be occupied largely on topics centered on crime in the city and push the city's reputation backward just as economic gains were starting to take hold." (Cplt. ¶ 15) Profeta expressed interest in "pursuing the matter." (Cplt. ¶ 16)

On December 7, 2010, Read gave Profeta a two-page outline of the magazine's mission, the necessary groundwork, initial staffing requirements, and certain recommendations. On December 12, 2010, Profeta emailed back, requesting more information about costs and stating that he, Profeta, had "no print experience." On December 15, 2010, Read furnished cost estimates and stated that monthly expenses of $40,000 could be covered by 25 buyers of full-page ads at below-market rates. On December 19, 2010, Profeta again replied that he had no experience in this area. (Cplt. ¶¶ 17–20) There matters stood between Read and Profeta for another 18 months.

Meanwhile, through 2011, Read engaged in a lobbying effort to line up advertising and backers for the new magazine. He lists some ten prominent

2

local institutions and philanthropies with whom he met and received a warm reception. These included Brick City Development Corp., MCJ Amelier Foundation, and Rutgers Business School. (Cplt. ¶¶ 21–22) He singles out Frank Giantomasi of the law firm of Genova & Burns. The contact with Giantomasi led to an August 8, 2011, meeting with Marc Berson of Fidelco, who said they would be "taking [*The Downtowner*] to the next level." (Cplt. ¶ 24) Apparently Berson did little at first, but Giantomasi remained involved. Read continued to promote the magazine idea to others. (Cplt. ¶¶ 25–28)

In July 2012, Read emailed Profeta, telling him that the magazine now had "high-profile stakeholders," and Profeta agreed to meet. (Cplt. 29–30) On July 18, 2012, Read met with Profeta, Coleman, and Kohn at the Associates offices. On August 9, 2012, Profeta wrote requesting a prospectus. Read sent Profeta details about the proposal, and Profeta recommended that he line up an outsourcing firm for advertising sales, which Read did. (Cplt. ¶¶ 31–34)

On September 10, 2012, Profeta emailed Read. He instructed Read to tell Berson and Giantomasi that they should supply office space and assistance with advertising support, while Profeta was "considering funding all the startup money." (Cplt. ¶ 35) On September 27, 2012, Read, Profeta, Kohn, Coleman, and the advertising outsourcing company met. (Cplt. ¶ 36) "[T]he Parties" then settled on six issues a year, and projected ad rates and salaries. (Cplt. ¶ 27)

On October 9, 2012, Read met with Berson, Profeta, and Giantomasi. Berson offered office space. Profeta listed potential advertisers, and Giantomasi said they are almost all "in." Profeta told Read, "Looks like you have your magazine." Profeta "acknowledged the Plaintiff's statement" that he wanted to retain a minority stake in the magazine. (Cplt. ¶¶ 38, 39)

On October 22, 2012, at Profeta's request, Read furnished a breakdown of competitors' ad rates. On November 7, 2012, Profeta said he wanted to "get started." He told Read that by Thanksgiving he could tell his staff they would be on payroll as of January 1, 2013. (Cplt. ¶¶ 40, 41)

3

At a Profeta company Christmas party on December 14, 2012, Coleman told Read's staff he looked forward to working with them. On December 16, 2012, Read emailed Profeta that he would finalize a prototype for Profeta to show to potential advertisers. On December 17, 2012, Profeta replied that they should take their best shot. On December 31, 2012, Read sent the "mockup finale" to Coleman, saying he wanted to get it to the printer as soon as possible. (Cplt. ¶¶ 44–46)

On January 16, 2013, Profeta emailed Read expressing concern about the deadlines, asking if Read could wait until summer, and stating that he was "interested in more of a freelance attachment" to the new magazine. (Cplt. ¶ 47) On January 18, 2013, Profeta emailed Read that he was having a "hard time" with the business model and was not comfortable risking $500,000. Communications then ceased. (Cplt. ¶¶ 47–49)

In August 2013, Read was surprised to see that Profeta had published the first issue of *Radius: Brick City & Beyond,* a 96-page, Newark-based magazine. (Cplt. ¶ 50)

Read alleges that *Radius* was built on Read's business model, contacts, and footwork. On the "Founders" page of *Radius* were listed Genova Burns, Giantomasi, Fedelco (Berson's firm), Brick City Development Corp., MCJ Amelier Foundation, and Rutgers Business School. Read had made contact with all in the course of gathering support and backing for *The Downtowner.* The box in *Radius* listing its staff included Coleman and Kohn. Its offices are in a Berson-owned building where Giantomasi's office is located. (Cplt. ¶¶ 50–53)

Read believes that his ideas and efforts were worth in excess of $200,000. (Cplt. ¶ 54)

## II. LEGAL STANDARD

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant,

4

as the moving party, bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a Rule 12(b)(6) motion, a court must take the allegations of the complaint as true and draw reasonable inferences in the light most favorable to the plaintiff. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.[2]

### III. ANALYSIS

#### A. Count 1 (theft of intellectual property);

Read alleges that Profeta stole his idea for a magazine and that the others participated in the process with the goal of lulling him into thinking this would be a launch of Read's, not Profeta's, project. Setting aside copyright, patent, and trademark law, an "idea" as such is protected under only limited circumstances. The tort of misappropriation of ideas is rooted in the notion

---

[2] Plaintiff incorrectly cites the superseded, pre-*Twombly* "no set of facts" standard, which is derived from *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99 (1957).

that the defendant, by exploiting a confidential idea entrusted to him,[3] has received "a benefit which it is unjust for him to retain." *Duffy v. Charles Schwab & Co.*, 123 F. Supp. 2d 802, 807–08 (D.N.J. 2000) (quoting *Flemming v. Ronson Corp.*, 258 A.2d 153, 156–57 (N.J. Super. Ct. Law Div. 1969), *aff'd*, 275 A.2d 759 (N.J. Super. Ct. App. Div. 1971)).

An idea cannot be "stolen" unless it constitutes a kind of property. Defendants argue, and plaintiff seems to agree, that this requires "(1) that the idea is novel; (2) it was made in confidence [to the defendant], and (3) it was adopted and made use of [by the defendant in connection with his own activities]." *Johnson v. Benjamin Moore & Co.*, 788 A.2d 906, 914 (N.J. Super. Ct. App. Civ.), *certif. granted and remanded on other grounds*, 796 A.2d 893 (2002) (quoting *Flemming*, 258 A.2d at 156–57; [bracketed] material is in *Johnson*). As Read points out, the issue at this stage is not whether those elements have been proven, but whether they have been alleged.

Novelty, ultimately an issue of law for the court, nevertheless depends on the underlying facts. The law requires "innovation, originality, or invention"; ideas that are obvious, or in the public domain, will not suffice. *See Duffy*, 123 F. Supp. 2d at 809. Here, the idea was to take advantage of *The Star-Ledger's* shrinking coverage and alleged focus on urban problems, and to publish a slick magazine touting the economic development of Newark, which was not receiving sufficient recognition. (Cplt. ¶¶ 14–15) Publishing a City-specific magazine is obviously not an original idea, but a scientific breakthrough is not required. Recognition of this business niche does not in itself establish novelty as a matter of law, but it raises an issue that may be explored in discovery. *Duffy* cited six factors that bear on novelty under New Jersey law, including specificity, commonality, originality, commercial availability, obviousness, and secrecy. 123 F. Supp. 2d at 810. Those, however, are not pleading

---

[3] Because the plaintiff and the individual defendants here happen to be male, for convenience I use the male pronoun even when referring to a generic plaintiff or defendant.

requirements, but factors that go into the ultimate factual determination. Such a determination cannot be made at the pleading stage.

Confidentiality, like novelty, is an issue that is far from settled, but is adequately raised by the Complaint. Defendants argue that confidentiality is not alleged in so many words. From the factual context, however, an inference arises that the idea, although shared among potential backers, was intended for limited use in the context of the *Downtowner* venture, not the *Radius* project.

As for defendants' use of the plaintiff's idea, the Complaint alleges facts from which it could be inferred that defendants exploited plaintiff's ideas in launching their own magazine. The resemblance between plaintiff's concept for *The Downtowner* and *Radius,* among other issues, remains to be explored. But "use" is sufficiently alleged.

The motion to dismiss is therefore denied as to Count 1.

### B. Count 12 (Unjust enrichment); Count 13 (Quantum meruit)

Another theory, similar to that underlying Count 1 but broader in scope, rests on the defendants' alleged acceptance of the value of Read's efforts without compensating him.

> Under New Jersey law, a claim under the quasi-contractual theory of unjust enrichment has two essential elements: "(1) that the defendant has received a benefit from the plaintiff, and (2) that the retention of the benefit by the defendant is inequitable." *Wanaque Borough Sewerage Auth. v. West Milford*, 144 N.J. 564, 575, 677 A.2d 747 (1996).

*Canadian Nat. Ry. v. Vertis, Inc.*, 811 F. Supp. 2d 1028, 1034 (D.N.J. 2011)

> In New Jersey, a plaintiff must establish the following elements in order to recover under a quantum meruit theory: (1) performance of services in good faith, (2) acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation for the services, and (4) the reasonable value of the services. *Starkey, Kelley, Blaney & White v. Estate of Nicolaysen,* 172 N.J. 60, 796 A.2d 238, 242–43 (N.J.2002).

7

*Kaplan v. Greenpoint Glob.*, No. 2:11-CV-04854 WJM, 2014 WL 4793024, at *5 (D.N.J. Sept. 25, 2014)

The complaint alleges that Read gathered backing and support for a magazine from the Newark business and philanthropic community; that he developed the concept of the magazine to the point of an actual mock-up; that he engaged an outsource advertising sales staff and identified prospects; and so forth. Profeta diverted the value of these efforts, he says, to launch his own magazine. Read's efforts and ideas, he alleges, had monetary value, value that was appropriated by defendants.

The factual allegations sufficiently support the elements of unjust enrichment and quantum meruit. The motion to dismiss is therefore denied as to Counts 12 and 13.

### C.     Count 3 (Interference with prospective economic advantage)

The tort of interference with prospective economic advantage has four essential elements:

> (1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with "malice," (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages. *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 563 A.2d 31, 37 (1989).

*Varrallo v. Hammond Inc.*, 94 F.3d 842, 848 (3d Cir. 1996). An expectation that is "reasonable" may fall short of a contractual entitlement. "Malice" requires, not ill will, but conduct that is "transgressive of generally accepted standards of common morality or of law." *Printing Mart*, 563 A.2d at 40 (citations omitted).

These flexible concepts are ill-suited to resolution on a motion to dismiss. The complaint alleges that Read expected that the launch of his magazine was imminent; that defendants interfered with the launch for the purpose of misappropriating the fruits of his efforts; that as a result *The Downtowner*

8

never launched; and that Read suffered economically as a result, at least to the extent of $200,000. That is a sufficient allegation.

The motion to dismiss is denied as to Count 3.

### D. Count 7 (Breach of contract); Count 5 (Breach of implied covenant of good faith and fair dealing); Count 4 (Promissory estoppel)

The complaint pleads that there was a contract, implied from the circumstances, to the effect that Read would supply services and ideas, and in exchange the defendants would give him "partnership ... and or compensation." (Cplt. ¶ 109)

> To state a claim for breach of contract, [plaintiff] must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations.

*Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007). Such a contract may of course be express, but may also be implied-in-fact by conduct, "in light of the surrounding circumstances." *Wanaque Borough Sewerage Auth. v. Twp. of W. Milford*, 677 A.2d 747, 752 (N.J. 1996) (quoting Restatement (Second) of Contracts § 4 comment a (1979)).

An alternative theory, pled where it is difficult to discern breach of a specific contractual provision, is breach of the implied covenant of good faith and fair dealing that is inherent in every contract:

> An implied covenant of good faith and fair dealing is present in all contracts governed by New Jersey law. *See Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420, 690 A.2d 575, 587 (1997). ... This obligation to perform contracts in good faith has been interpreted in New Jersey to mean that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Sons of Thunder*, 148 N.J. at 420, 690 A.2d at 587

*Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 169-70 (3d Cir. 2001)

Another alternative theory, pled where it is difficult to establish formation of a contract, is promissory estoppel:

> [T]o establish a claim for promissory estoppel, Plaintiffs must show: (1) a clear and definite promise by the promisor; (2) the promise must be made with the expectation that the promisee will rely thereon; (3) the promisee must in fact reasonably rely on the promise, and (4) detriment of a definite and substantial nature must be incurred in reliance on the promise. *Malaker Corp. Stockholders Protective Committee v. First Jersey Nat'l Bank*, 395 A.2d 222, 230 (N.J. Super. Ct. App. Div. 1978).

*Rost v. Avelo Mortgage, LLC*, No. CV 15-3254, 2015 WL 6737026, at *5 (D.N.J. Nov. 3, 2015).

Implication of a contractual agreement from the circumstances, the contours of good faith performance, and the scope of any promises or reasonable reliance, are all fact-bound issues. They cannot be resolved at this, the pleading stage.

The motion to dismiss as to Counts 4, 5, and 7 is denied.

### E. Counts 2 (Fraud) and 15 (Equitable fraud); Count 6 (Conversion); Counts 9 (Negligence) and 11 (Gross Negligence); Count 18 (Injunctive relief)

Counts 2 (Fraud) and 15 (Equitable fraud); Count 6 (Conversion); and Counts 9 (Negligence) and 11 (Gross Negligence) need not be discussed in detail. For the reasons expressed above, these counts, too, raise issues that cannot be determined as a matter of law on a motion to dismiss. Whether or not these claims are present in the case, discovery will take much the same shape. They may therefore most profitably be dealt with on a motion for summary judgment. Count 18 (Injunctive relief) is a form of relief that may be sought if the plaintiff should prevail. It, too, need not be dealt with at this stage. The motion to dismiss will therefore be denied as to Counts 2, 15, 6, 9, 11, and 18.

Finally, I consider two clear candidates for dismissal.

### F. Count 10 (NJ RICO)

Count 10 cites the New Jersey RICO statute, N.J. Stat. Ann. § 2C:41-1, *et seq.*, which, like the federal statute, provides for a civil cause of action, *see* N.J. Stat. Ann. § 2C:41-4.

> The gravamen of a RICO violation, frequently referred to as "racketeering," is the involvement in the affairs of an enterprise through a pattern of racketeering activity. Specifically, the RICO Act provides:
>
> c. It shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
>
> d. It shall be unlawful for any person to conspire as defined in N.J.S. 2C:5-2, to violate any of the provisions of this section. [N.J.S.A. 2C:41-2.]

*State v. Ball*, 661 A.2d 251, 257-58 (N.J. 1995).

> A "pattern of racketeering activity," according to *N.J.S.A.* 2C:41-1d, requires:
>
> (1) Engaging in at least two incidents of racketeering conduct one of which shall have occurred after the effective date of this act and the last of which shall have occurred within 10 years (excluding any period of imprisonment) after a prior incident of racketeering activity; and
>
> (2) A showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

*Ball*, 661 A.2d at 261-62. "Racketeering" is defined as a violation of any of a specific list of criminal statutes. N.J. Stat. Ann. § 2C:41-1(a).

The NJ RICO count of the complaint lacks all specificity. No specific crimes are alleged. The alleged pattern is not one of specified crimes, but a "pattern of lies and deception." It consists of an allegation "on information and

11

belief" that the defendants have "collectively conspired or agreed amongst themselves to take ideas from individuals with promises to develop, market, and/or sell these ideas." (Cplt. ¶ 121) It is not enough simply to hypothesize that defendants who allegedly did something to plaintiff must have done the same to others, and that if they did, that would constitute a pattern.

The motion to dismiss is therefore granted as to Count 10.

### G. Count 14 (Breach of fiduciary duty)

Read alleges that he was in a joint venture with the defendants, who therefore owed him a fiduciary duty, which they breached. The allegations do not meet the standards of *Twombly* and *Iqbal, supra*.

> A joint venture is " 'an undertaking usually in a single instance to engage in a transaction of profit where the parties agree to share profits and losses.' " *Wittner v. Metzger*, 72 N.J. Super. 438, 444, 178 A.2d 671 (App. Div.) (quoting *Kurth v. Maier*, 133 N.J. Eq. 388, 391, 31 A.2d 835 (E. & A.1943)), *certif. denied*, 37 N.J. 228 (1962). A joint venture ordinarily has some or all of the following elements: (1) a contribution by the parties of money, property, effort, knowledge, skill or other assets to a common undertaking; (2) a joint property interest in the subject matter of the venture; (3) a right of mutual control or management of the enterprise; (4) an expectation of profit; (5) the right to participate in profits; and (6) limitation of the objective to a single undertaking. *Ibid.*
>
> To create a joint venture, the parties must agree upon essential terms because a "basic criterion" for the establishment of a joint venture is "the voluntary agreement of the parties to form a relationship with the intent to create a joint venture." *Sullivan v. Jefferson, Jefferson & Vaida*, 167 N.J. Super. 282, 290, 400 A.2d 836 (App. Div. 1979). " 'The sine qua non of joint venture is a contract purposefully entered into by the parties.' " *Id.* at 289, 400 A.2d 836 (quoting *Wittner, supra*, 72 N.J.Super. at 443, 178 A.2d 671).

A fiduciary relation will not be lightly inferred. The Complaint here does not allege with requisite specificity that the parties "agree[d] on essential terms" of a joint venture. To be sure, there were conversations and plans. The

12

magazine itself, however, was never launched. There is no allegation that they agreed on, or even discussed, the essentials: who was to own the magazine, who was to manage it, whether there was to be profit sharing, and on what basis; and so on.

There is a reference to Profeta's having "acknowledged the Plaintiff's statement" that he wanted to retain a minority stake in the magazine. (Cplt. ¶ 39) Acknowledging someone's statement that he wants a minority share falls far short of entering into a fiduciary relationship as joint venturors to divide profits. Another allegation that Read was impliedly offered "partnership ... and/or compensation" similarly fails the specificity test. (Cplt. ¶ 109) Also unspecific as to terms is the blanket allegation in Count 2 (fraud) to the effect that all acts and statements were undertaken "with the intention" of representing to Read that the magazine would be a "joint venture" in which Read would be "involved." (Cplt. ¶ 78)

The motion to dismiss is granted as to Count 14.

## IV.  CONCLUSION

For the foregoing reasons, the motion to dismiss filed by the defendants is GRANTED IN PART and DENIED IN PART. Counts 10 and 14 are DISMISSED WITHOUT PREJUDICE to the filing, within 30 days, of an Amended Complaint. The motion to dismiss is DENIED as to all other counts.

An appropriate Order will issue.

Dated: April 15, 2016

**KEVIN MCNULTY**
**United States District Judge**