PHILIP READ,

      Plaintiff,

    v.

PAUL PROFETA; PAUL V. PROFETA &
ASSOCIATES; RADIUS: BRICK CITY &
BEYOND; STEVEN COLEMAN; and
WILLIAM KOHN

      Defendants.

Civ. No. 15-02637-KM-JBC

OPINION

**KEVIN MCNULTY, U.S.D.J.**:

### Introduction and Summary

This matter arises from plaintiff Philip Read's idea for a magazine that would focus on downtown Newark, New Jersey, to be called *The Downtowner*. On December 8, 2010, Read, a former reporter for the *Star-Ledger* newspaper in Newark, emailed defendant Paul Profeta an unsolicited "blueprint" of his idea for the magazine. The two had discussions about the magazine idea into early 2011, and later revived their discussions in July 2012. Discussions broke down for good in January 2013, when the two could not agree on a business structure.

In the fall of 2013, however, Profeta launched his own Newark-centric magazine, called *Radius: Brick City and Beyond*.[1] On April 14, 2015, Read filed this action against Profeta for "stealing" his magazine idea. *Radius* lost money, and publication ceased in 2017.

Read was a man with an idea, but little capital. An eager suitor, he necessarily assumed the burden of developing the concept into something that would attract investment. Profeta, the party being wooed, could remain

---

[1] "Brick City" has emerged as a nickname for Newark.
https://www.nj.com/newark/2005/12/gateway_renaissance_a_reviving.html;
https://www.urbandictionary.com/define.php?term=Brick%20City

noncommittal at little cost to himself. The issue here is whether Read, rather like the old Book-of-the-Month Club, succeeded in placing an obligation on the solicited party. One need not wholly endorse the manner in which Profeta dealt with Read, a person of lesser means and business experience, to find that Profeta did not take on any such legal obligation.

Before discussing Read's claims individually, I will divide them into two classes. The division is imperfect—some claims are ill-defined, or might straddle the two classes—but the classification is still conceptually useful.

Class A consists of Read's claims that Profeta made an enforceable commitment to fund and publish *The Downtowner* magazine. In these claims, Read seeks the benefit of that bargain, primarily his expected salary or profit as editor of *The Downtowner*. I find the evidence insufficient to create a triable issue that Profeta committed to a contract of employment or the equivalent.

Class B consists of Read's claims that, in the course of preparing for the launch of the aborted *Downtowner* magazine, he performed services or incurred expenses, and that Profeta had a duty to reimburse him for the value of those services or expenses. The earliest statements by Profeta that suggested even a potential commitment to the project occurred in September/October 2012 (*see* pp. 11–12, *infra*). From that date on, Read might have been entitled to the value of his expenditures or services until discussions broke down in January 2013, *if* those statements had constituted a sufficiently firm promise. But they didn't; the evidence shows that both parties left it vague, and that Profeta imposed conditions, never fulfilled, on his assent. If Read expected to be compensated, he needed to be clear; if necessary, he needed to state that he would not perform further services without some kind of commitment to be paid for them.

Critically, there is no Class C. What is *not* claimed here is that Profeta pirated Read's idea and used it to turn a profit. *Radius* lost money, to the tune of some $500,000. Understandably, Read is not eager to claim his equitable share of that.

Profeta, for his part, closes the circle of blame by asserting counterclaims in which he attributes the *Radius* losses to Read's defamatory accusations that his idea was stolen. Critical elements of these claims, too, are unsupported by sufficient evidence to create a triable issue of fact.

Each side has filed a motion for summary judgment seeking dismissal of the other's claims. (DE 64, 65). Both of those motions are granted. Also before the Court is Read's motion to strike portions of a declaration submitted by Profeta and for sanctions, which is granted in part and denied in part. (DE 72).

## I.    Facts and Procedural History

Unless otherwise indicated, the facts recited below are not disputed.[2]

---

[2]    Certain key items from the record will be abbreviated as follows:

DE __ = Docket entry number;

AC = Amended Complaint (DE 25);

DSJBr = Defendants' summary judgment brief (DE 64-2);

DSUMF = Defendants' statement of undisputed material facts (DE 64-1);

PBr = Plaintiff's brief in opposition to defendants' summary judgment (DE 71);

PRS = Plaintiff's response to defendants' statement of undisputed material facts (DE 71-1, at 1-15);

PSMF = Plaintiff's statement of material facts in dispute (DE 71-1, at 16-33);

DSJRBr = Defendants' reply brief in support of its summary judgment motion (DE 73);

PSJBr = Plaintiff's summary judgment brief on defendants' counterclaims (DE 65);

PSUMF = Plaintiff's statement of undisputed material facts (DE 65-4);

DBr = Defendants' brief in opposition to Read's summary judgment motion (DE 70);

DRS = Defendants' response to plaintiff's statement of undisputed material facts (DE 70-1)

DSMF = Defendants' statement of material facts (DE 70-1);

PSJRBr = Plaintiff's reply brief in support of its summary judgment motion and motion to strike (DE 72-2);

DSBr = Defendants' brief in opposition to Read's motion to strike (DE 74);

PSRBr = Plaintiff's reply brief in further support of motion to strike (DE 75).

## A. Facts on Defendants' Motion for Summary Judgment[3]

Plaintiff Philip Read worked as a reporter for the *Star-Ledger* newspaper in Newark from 1997 to 2010. (PSMF ¶1; (DE 64-3, Ex. A, Jan. 16, 2018

---

[3]    Prior to outlining the pertinent facts in this matter, I make the following observation regarding Read's responses to the defendants' statement of undisputed facts. The permissible options in response to a statement are "admitted" or "denied." Read, however, has found a third alternative. He frequently responds with "qualify" and inserts non-pertinent or nonresponsive material, even when the defendants' proffered statement of fact derives from Read's own deposition testimony. (*See, e.g.,* PRS ¶¶2, 3, 5, 7, 10, 16, 22, 28, 29, 30, 35, 37, 47). Here is an example:

> 1. In or around November 2010, plaintiff Philip Read ("Read") approached Profeta and asked his permission to tell Profeta about an idea he had for a magazine. *See* Deposition Testimony of Philip Read, dated February 8, 2018, at 195:2-13, attached as Exhibit B to the Declaration of Christine F. Marks ("Marks Decl.").
>
> **Qualify. The Plaintiff testified that, as to his idea, Profeta "was very open to it." (Defendants' Exhibit B, 195: 16-17).**
>
> 2. [In late 2010] Profeta responded that, having never run a newspaper or being familiar with the economics involved, he would not know what questions to ask or where to start. Marks Decl., Exhibit B at 197:19-23; 198:7-10.
>
> **Qualify. The Plaintiff testified that, by mid-2012, he thought "there was an agreement" (Defendant's Exhibit B, 196:19-21).**

(DSMF ¶¶1-2; PRS ¶¶1-2). Whether Read thought there was an agreement by mid-2012 is not responsive to the state of negotiations in November of 2010. "The proper response to a procedurally correct Rule 56 motion is to file a counter statement that *denies* the fact is material, *admits* the material fact, or *denies* the material fact by counter proofs conforming to the rules of evidence." *Falcon v. Cont'l Airlines*, 2014 U.S. Dist. LEXIS 20146, at *6 (D.N.J. Feb. 18, 2014) (alteration in original) (quotation and citation omitted); *see also Schwartz v. Hilton Hotels Corp.*, 639 F. Supp. 2d 467, 469 n.2 (D.N.J. 2009) (deeming facts that were neither admitted nor denied in Rule 56.1 statement to be undisputed).

Where Read is nonresponsive, and thus fails to create an actual dispute about the fact alleged, the Court will deem defendants' facts as admitted pursuant to Local Civil Rule 56.1; *see also Barker v. Our Lady of Mount Carmel Sch.*, 2016 U.S. Dist. LEXIS 118067, at *2 n.1 (D.N.J. Sep. 1, 2016) (deeming defendants' factual assertions admitted where plaintiff "add[ed] additional facts but d[id] not contest the asserted proposition[]." (citation omitted)), *appeal dismissed*, 2017 U.S. App. LEXIS 18125 (3d Cir. July 26, 2017).

Coincidentally, Read has requested that this Court deem certain facts asserted by Read to be admitted by Profeta in *his* reply brief in support of *his* motion for summary judgment on Profeta's counterclaims, contending that a proper response to a supported material fact is either "admit or deny." (PSJRBr at 10-11).

Deposition of Philip Read, at 23:18-22 (hereinafter "Read Dep. I"))). He focused on redevelopment in Newark for about eighteen months before he accepted a buyout and resigned. (DE 71-5, at 8, Plaintiff's Answers to Defendants' First Set of Interrogatories ¶10). Read believed there was a market opportunity for a "city magazine" in Newark. (*Id.*). While other similarly situated cities had established city-centric magazines, Newark had not. (PSMF ¶3).

### 1. Initial 2010–11 Discussions

In November of 2010, Read asked defendant Paul Profeta, the principal of Paul V. Profeta & Associates, if he could pitch him an idea he had for a Newark-centric magazine, to be called *The Downtowner*. (DSUMF ¶1; DE 64-3, Ex. B, Feb. 8, 2018 Deposition of Philip Read, at 195:8-13 (hereinafter "Read Dep. II")).[4] On December 8, 2010, Read emailed Profeta a "blueprint" of his idea for *The Downtowner*. (PSMF ¶6; DE 71-8, Ex. E, E-mail from Philip Read to Paul Profeta (Dec. 8, 2010, 02:05 PM)).

Read's email stated the mission of *The Downtowner*: "to give the Halsey Street/Broad Street neighborhood an identity and sense of liveliness with an in-your-hands news product that would create a buzz and serve to solidify the good efforts of many who see a future in the rebirth of New Jersey's largest city." (DE 71-8, Ex. E). Read suggested that Profeta, who had dedicated himself "to the revitalization of Newark . . . might be someone willing to lead a startup intended to give the rebirth a face of its own on a regular basis." (*Id.*).

Read indicated that they would need to gather a team of "like-minded investors" and stakeholders "to produce the seed capital for the start-up," and to set up substantial advertising commitments. (*Id.*). Read provided a list of "initial" staffing requirements, including two full-time writer-editors, an advertising salesperson, an advertising artist to design the ads, and an editorial page designer. (*Id.*). Profeta would serve as the publisher. (*Id.*).

---

[4] Profeta submitted certain portions of Read's deposition transcripts. Read's opposition includes additional portions of his deposition transcripts. (*See* DE 71-4, Ex. A (copy of Read Dep. I); DE 71-26, Ex. W (copy of Read Dep. II)).

Read also required a freelance budget for writers, a storefront office on Halsey or Market Street, and editorial/production computer equipment. (*Id.*). Read's email also suggested that *The Downtowner* be published monthly and distributed for "free" or for a nominal price of less than a dollar. (*Id.*). Read noted that his salary at the *Star-Ledger* was formerly $93,804 and that his son could work as the advertising artist for about $40,000. (*Id.*; PSMF ¶8).

In response, Profeta asked Read if he had "any idea what it would cost to launch" the magazine, noting that he did not have any print experience. (DE 71-8, Ex. E, E-mail from Paul Profeta to Philip Read (Dec. 12, 2010 09:52 PM)). On December 15, 2010, Read provided a breakdown of costs. (DE 64-3, at 79, E-mail from Philip Read to Paul Profeta (Dec. 15, 2010 05:34 PM)).

Profeta told Read that he had never run a newspaper before, was not familiar with the economics of running such a publication, and that he did "not know where to start or what questions to ask." (DSUMF ¶2; DE 64-3, Ex. D, at 79[5]). Read believed that Profeta was "very open" to his idea at the time. (Read Dep. II at 195:16-17). Read did not tell Profeta that his ideas were confidential, and the parties did not execute a confidentiality agreement. (DSUMF ¶3; Read Dep. II at 195:21-25).

In early 2011, the parties' initial discussions regarding the magazine ended, with Read advising Profeta that he was going to approach other potential investors. (DSUMF ¶4; PRS ¶4; PSMF ¶12). In 2011, Read discussed his magazine with other potential backers, including Frank Giantomasi of the law firm of Genova, Burns & Giantomasi, and Mark Berson of Fidelco. (PSMF ¶¶12, 39; DSUMF ¶5; Read Dep. II at 202:6-14; DE 71-19).

Read created a visual depiction of his magazine idea and presented his idea to other potential backers, including Dan Stroll of Rutgers Business School, Jay Gottesman of Edison Properties, Helen Paxton of Rutgers/Newark,

---

[5]     This number refers to the automatically generated ECF page number located in the top right-hand corner of defendants' exhibits, which were all filed under docket entry 64-3.

Barbara Kaufman of the Newark Regional Business Partnership, Stefan Pryor of Brick City Development, Vaughn Crow of the Amelior Foundation, Jeff Normal of the New Jersey Performing Arts Center, and Kathy Weaver of the Newark Alliance. (DSUMF ¶6; PRS ¶6; PSMF ¶44; Read Dep. II at 225:17-227:4; DE 71-19). Read did not ask anyone he met with to execute a confidentiality agreement. (Read Dep. II at 228:16-18; DSUMF ¶39; PRS ¶39).

### 2. Reopened 2012–13 Discussions

Sometime in July of 2012, Read reapproached Profeta about the magazine. (DSUMF ¶7; Read Dep. II at 199:13-16).[6] Read advised Profeta that he had persuaded some "significant people [to] step forward as stakeholders" for *The Downtowner*. (DSUMF ¶8; PRS ¶7; Read Dep. II at 200:2-4). Between July of 2012 and October 2012, Profeta asked Read "to basically educate him about magazines." (PSMF ¶40).

On July 18, 2012, Read emailed Profeta regarding a meeting they had held that day. (PSMF ¶14; DE 71-12, Ex. I, Email from Philip Read to Paul Profeta (July 18, 2012 06:51 PM)). Read's email was seemingly a response to a question that Profeta had posed during the meeting regarding the "editorial-advertising mix" of "the competition." (DE 71-12, Ex. I). Read provided Profeta with a few examples of city magazines, their editorial/advertising ratio, and sample "rate cards," which detailed prices for various ad placement options. (DE 71-12, Ex. I; PSMF ¶¶41-42). Read's email noted that the deputy editor and design director of *The Downtowner* would not need health benefits, but that the three other full-time employees, including Read, would. (*Id.*).[7]

---

[6]    Read asserts that he "spent the next year personally lobbying stakeholders in the city, finding doors opening for him because of his reputation, and getting the greatest support from Frank Giantomasi." (PSMF ¶¶12, 13; DE 71-11). It was allegedly because neither Giantomasi nor Berson was willing to take on the role of publisher that Read "re-approached Profeta." (PSMF ¶12). For these facts, which clearly are within Read's own knowledge and control, he cites only the discovery responses of the defendants, which in any event are not supportive.

[7]    Read alleges that the next event that occurred was on August 9, 2012, when Profeta requested certain information about the magazine from Read. (PSMF ¶15). Read's citation for this factual assertion, however, is the July 18, 2012 email and "Defendant's Response, p. 187." The July 18, 2018 email does not support Read's

On August 9, 2012, Read sent Profeta another email with more information. (PSMF ¶16; DE 71-13, Ex. J, Email from Philip Read to Paul Profeta (Aug. 9, 2012 12:22 PM)). Read's email stated that Giantomasi told him that either Berson or Giantomasi would provide office space, although Read believed that a downtown Newark address "would be best." (*Id.*). Read provided Profeta with an average full-page advertising rate and indicated that he had a person in mind for the advertising salesperson position. (*Id.*).

Read stated that Giantomasi and Berson encouraged the project. (*Id.*). Giantomasi allegedly told Read that "I know this is going to happen," and Berson told him that "we're going to take this to the next level." (*Id.*). Read claims that their interest in the project "just died," however, for "want of someone to assume the 'publisher role.'" (*Id.*). Read suggested a meeting with himself, Profeta, Berson, and Giantomasi. (*Id.*).

In his August 9, 2012 email, Read also stated that he had a "Plan B" for the magazine. (*Id.*). Instead of ten issues per year, the magazine would run six. (*Id.*). This alternative plan would reduce printing costs, but would also yield less advertising revenue, and would require the staff to accept "greatly reduced salaries." (*Id.*).

Read sent Profeta a follow-up email on August 23, 2012, indicating that he had found an ad salesperson who would work at a salary of $800 per week, plus a ten percent commission. (PSMF ¶17; DE 71-14, Ex. K, E-mail from Philip Read to Paul Profeta (Aug. 23, 2012 01:28 PM)). Read suggested setting up a meeting with the ad salesperson and asked whether he should set up the meeting with Berson and Giantomasi. (*Id.*).

On August 27, 2012, Profeta responded that Read should set up the meeting with Berson and Giantomasi, and stated that he would meet with the

---

assertion and the second citation to "Defendant's Response" is not a citation to a particular document in the record. The defendants' discovery responses submitted by plaintiff do not contain a page 187. (*See* 71-11, Ex. H).

ad salesperson. (DE 71-14, Ex. K, E-mail from Paul Profeta to Philip Read (Aug. 27, 2012 08:54 AM)).

On September 10, 2012, Read emailed Profeta again. Read wrote that he was having difficulty scheduling a meeting with the ad salesperson, but that he was available to meet with Berson and Giantomasi "anytime." (PSMF ¶18; DE 71-15, Ex. L, E-mail from Philip Real to Paul Profeta (Sept. 10, 2012 07:26 PM)). Read provided more information about his "Plan B," which reduced the "start-up/ramp-up costs marginally from $132,000 to $118,000," lowered the per-month ad sale minimum, and required a reduction in salary "for the key players." (*Id.*).

In response to this email, Profeta advised Read that he was considering funding the entire magazine venture, subject to a positive outcome of his due diligence and a mutually agreeable business structure. (DSUMF ¶¶9-10; PRS ¶¶9-10; PSMF ¶18; DE 64-3, Ex. E at 85; DE 71-15, Ex. L). Profeta stated that he still wanted to meet with Berson and Giantomasi to see if they would consider donating office space. (*Id.*).

Read understood that Profeta was conducting due diligence and that Profeta was not at this time promising to pay him. (DSUMF ¶12; PRS ¶12; Read Dep. II at 243:11-14). Read claims, however, that he relied upon Profeta's "assurances" that Profeta was considering funding the magazine. (Read Dep. II at 243:15-25).

On September 18, 2012, Read emailed Profeta, advising Profeta that he had met with representatives from Bayard, Oot, James & Associates (hereinafter "Bayard"), a company to which magazines outsource their ad sales. Read stated that those Bayard representatives were available to meet with Profeta. (PSMF ¶19; DE 71-16, E-mail from Philip Read to Paul Profeta (Sept. 18, 2012 02:46 PM)). On September 25, 2012, the meeting was scheduled for September 27, 2012. (PSMF ¶20, DE 71-17).

In the meantime, on September 26, 2012, in response to Profeta's questions, Read emailed Profeta with a breakdown of "potential income expenses and rates." (PSMF ¶21; DE 71-18). Read provided ad rate cards,

display advertising, and starting salaries. (DE 71-18). Read estimated that the total per-issue expense was $63,840. That figure, however, did not include expenses for items (fixed costs, evidently), such as office space, phone service, or medical benefits for the staffers. (*Id.*). Read also provided Profeta more background on Bayard, its experience with selling ads in Newark, and a monetary "set-aside" for Bayard. (DE 71-18).

Also on September 26, 2012, Read sent Profeta a separate email that included a presentation booklet, or "Executive Summary," reflecting a six-issue-per-year model. (PSMF ¶22; DE 71-19). The cover page of the Executive Summary was marked "confidential." (DE 71-19). The Executive Summary described the magazine in the following manner:

> The Newark Downtowner™ is intended to be a vehicle to give Military Park and Halsey and Broad Street Neighborhoods (and their environs) an identity and sense of liveliness with an in-your-hands news product that would create a buzz and serve to solidify the efforts of many who see a future in the fragile rebirth of New Jersey's largest city.
>
> The magazine format — published six times a year — will be focused on Newark's downtown and will provide a voice that is being lost in ever-shrinking daily newspapers that choose to give their content away for free online, in the process undercutting their ability to maintain the more lucrative print advertising as well as staff to produce content, in particular anything other than the latest Newark shooting or city-hall brouhaha.

(DE 71-19; PSMF ¶7). The Executive Summary identified the magazine's target audience as commuters from wealthier suburbs, college students, and "higher income Newarkers." (DE 71-19; PSMF ¶56).

In terms of competition, the Executive Summary noted that there were "some weeklies in Newark now, but they are almost entirely advertising vehicles running poorly written press releases verbatim." (*Id.*). Hoboken and Jersey City, it disclosed, had both recently launched city magazines. (*Id.*).

The Executive Summary further explained the magazine's proposed staffing. Full-time staff included Read as editor-in-chief; Russell Ben-Ali as deputy editor; Bob Bogert as design director; and Philip Read Jr. as senior

10

graphics designer. (*Id.*). Photographers and "some writing contributors" would be funded through a freelance account. (*Id.*). Per-issue payroll was estimated as $48,000. (*Id.*).[8]

On October 5, 2012, Read again emailed Profeta about the business plan for the magazine. (PSMF ¶23; DE 71-20). In terms of ad sales, Read indicated that when he initially presented the magazine idea to potential stakeholders, he sought a one-year commitment, and then suggested six months, but was not successful. (DE 71-20). The best he could accomplish was "an informal 6-month commitment" from Rutgers Business School. (*Id.*).

In addressing a business structure, Read indicated that Profeta would be the majority owner and publisher. (*Id.*). Read stated that he would "like to retain a small minority stake, in recognition for developing the idea and spending the better part of 2 years nurturing it." (*Id.*). Read testified that he believed that he and Profeta were "partners," but the parties never agreed, for example, to share in profits or losses. (PSMF ¶84; Read Dep. II at 109:10-20).

On October 9, 2012, Profeta and Read had a meeting with Berson and Giantomasi. (PSMF ¶24; DE 71-16; DE 71-21). In that meeting, Profeta told Read that "it looks like you got your magazine." (DSUMF ¶13; PRS ¶13; Read Dep. II at 263:12-13). Read testified that if this meeting had not gone well and Profeta had not given him this assurance, Read "probably would have taken a couple more pokes at people, and if nothing materialized quickly, I would [have] cut the cord." (Read Dep. II at 157:2-12). Even at that point, Read knew that Profeta was not "100 percent committed" to move forward with *The Downtowner*. (DSUMF ¶14; Read Dep. II at 263:16-20).[9]

---

[8]    Read's alleges that he "produced a Prospectus 1 in 2011" and "The Plaintiff's Prospectus 2 was marked 'Confidential' and described as 'an important void to fill.'" (PSMF ¶¶60-61). These factual assertions do not contain a citation to the record, and it is unclear whether these allegations relate to the information contained in the Executive Summary. Read's statement of material facts then goes on to describe the information contained in "Prospectus 2" without a proper citation. (*See* PSMF ¶¶61-64).

[9]    Read's response to the "not 100 percent committed" allegation was "Qualify. The Plaintiff testified that it 'was 98 percent' (Defendants' Exhibit B, 21-24)." (PRS

Nonetheless, Read testified that by mid-2012 he had "an agreement" with Profeta. (Read Dep. II at 196:19-20). At his deposition, Read was asked to state the terms of that alleged agreement. Read answered that Profeta "was passionate about the magazine and we should go forward, and this was going to happen now, and his CFO was saying I look forward to working with you." (Read Dep. II at 196:21-25; see also PSMF ¶38).

In a follow-up email that same day, October 9, 2012, Read expressed gratitude to Profeta for Berson and Giantomasi's evident enthusiasm about creating a "Founders Club," or a page in the magazine that would be dedicated to its "Founders." (DE 71-21; Read Dep. II at 269:14-21; DE 71-27, Ex. X, at 76:12-77:9 (July 10, 2018 Deposition Transcript of Paul Profeta (hereinafter "Profeta Dep.")))[10] Read told Profeta that he believed that they were getting closer to launching the magazine and that he hoped they could "set up a business structure by month's end." (DE 71-21).

On October 14, 2012, Profeta responded that he would not fund the venture until there were "at least 40 members in the Founder's Club" and that he would start trying to secure such members that week. (Id.). On October 17, 2102, Read provided Profeta with a final proposed ad rate card. (DE 71-22).

On November 7, 2012, Read emailed his staff, stating that Profeta had told him that the magazine was going to happen, possibly in thirty days, and that the staff would be on payroll by January 1. (PSMF ¶55; DE 71-28). Read's email to the staff also indicated that Profeta had asked him to come up with a half-page contract for "founders." (Id.)[11]

---

¶14). Defendants' Exhibit B does not contain pages 21-24 and lines 21-24 on page 263 do not support Read's proposition. Nor does Read Dep. I, which contains pages 21-24, support Read's proposition. I will search no further for the "98%" figure.

[10] Read submitted Profeta's deposition as an exhibit in support of his motion for summary judgement. (DE 65-15). The role of these "founders" is ill-defined in the papers; it is not clear whether they were to buy advertising space, merely lend their name to the publication, both, or something else.

[11] Read has alleged that "Profeta told the Plaintiff's staff that the Magazine was going to happen." (PSMF ¶88 (citing Read Dep. II at 153: 9-10)). The cited portion of Read's deposition does not support this alleged fact. Read testified as follows:

On November 19, 2012, Profeta invited Read and the magazine's staff to his office's Christmas party. (PSMF ¶27; DE 71-24). Read accepted the invitation on behalf of himself and the staff, and stated that he "trust[ed] that we'll be official by then." (DE 71-24). Profeta responded that he would "love" to tell Read that they would be "officially rolling by Dec. 14th," but had "doubt[s] [that they] would be that lucky." (*Id.*).

Around December 3, 2012, Profeta asked Read for a "mockup" of the magazine that could be distributed to the Founder prospects so that they could "visualize what they — hopefully — would be putting their names on." (PSMF ¶28; DE 71-25). On December 16, 2012, Read responded to Profeta's email, and stated that he needed a photo of Profeta for the mockup. (DE 71-29). He further stated that he had attempted to "get a hold of Ledger photos that ran with [his] old stories," but was unable to do so. (*Id.*). He further stated that the stories in the mockup, without the art, "simply won't do." (*Id.*). Read further noted that Profeta would be away from December 20th to January 4th and expressed hope that the magazine could nonetheless launch on January "14th, fingers crossed." (DE 71-29; PSMF ¶67).

Profeta responded on December 17, 2012 that they "should go forward with the best we [have] and take our best shot. I will get a shot taken of Marisa and me." (DE 71-29). As of December 2012, Read believed that Profeta was entirely committed to funding the magazine because he had directed Read to send the mockup to the printer. (Read Dep. II at 265:17-24; PSMF ¶47).

---

Q. And you approached Mr. Profeta in mid 2012? He was enthusiastic?

A. Absolutely.

Q. He didn't commit to it, right?

A. As I said to my staff, he was so enthusiastic, you knew this was going to happen.

(Read Dep. II at 153:5-10). The documentary evidence in the record has established that *Read* told his staff that this project "was going to happen." Read has not pointed to anything in the record to establish that *Profeta* communicated this to Read's staff.

On January 8, 2013, Profeta emailed Read, stating that he had reviewed the mockup. Profeta expressed concern about Read's January 14 deadline, in part because he had not yet spoken to any Founders and the mockup was still in draft form. (DE 71-30). On January 10, 2013, Read responded that he would push the deadline back to February 4 and asked if Profeta would consider putting each staff member on a "small retainer" of $1,000 per month. (*Id.*).

In January of 2013, Profeta learned that another Newark-centric magazine, *Newark Bound*, was being published. (DSUMF ¶15; PRS ¶15; Read Dep. II at 274:11-14). Read testified that he was not "surprised" to learn of the publication because he "was shopping this around for two years" and knew "other people might do it." (DSUMF ¶16; Read Dep. II at 274:11-275:14). Read admitted that he did not "own" the idea of creating a city magazine in Newark. (DSUMF ¶36; PRS ¶36).

In January 2013, Profeta told Read that he was not moving forward with Read's magazine idea. (DSUMF ¶17; Read Dep. II at 276:4-7; PSMF ¶11; DE 71-11). In an email exchange between Read and Profeta on January 16, 2013, Profeta told Read that the proposed business model, which included a formal office and staffed employees on a payroll, was not financially feasible. (DSUMF ¶18; PRS ¶18; PSMF ¶69; DE 64-3, Ex. F, at 88). Profeta also expressed concern that Read's proposed deadlines were "not realistic." (DE 71-31).

Profeta related discouraging conversations with his wife, who used to work for Hearst Corporation and was the managing editor of Cosmo Girl magazine, as well as with her colleagues in the magazine business. Through those conversations, Profeta said, he learned that the magazine world had shifted away from formal offices and payroll. (DE 64-3, Ex. F, at 88). Instead, individuals were hired on a per project basis: writers were paid per article, graphic designers were paid per issue, and photographers were paid per shoot. (*Id.*). Such individuals also furnished their own equipment. (*Id.*). Profeta asked Read if he could wait until the summer to launch the magazine so that they would have time to consider a freelance business model. (*Id.*).

Read responded that same day that he was not interested in the freelance model. (DSUMF ¶19; PRS ¶19; DE 71-31). Read wanted salaried staff because New Jersey "has the highest property taxes in the nation and has a high cost of living." (Read Dep. I at 27:17-21). Read's email to Profeta stated that he could not work for a freelance salary and afford to pay his property taxes and health benefits. (DE 71-31). Read also stated that he wanted a physical office space, and that the cost would not be a significant concern if the space could be donated by Berson or Giantomasi. (Id.). Read told Profeta that he was flexible with deadlines, "but would need a firm commitment of some kind, as would the staff." (DE 71-32, at 3).

On January 18, 2013, Profeta responded to Read that he was "having a hard time gaining confidence in your business model, given what I have learned lately about magazines. $500,000 is a huge amount of money to risk on a program that I do not feel comfortable with." (PSMF ¶71; DE 71-33). On January 22, 2013, Read requested that Profeta return his "business plan/presentation booklet" as well as the mock-up prototype. (DE 71-34).

Read acknowledged that there was nothing obligating Profeta to continue with the magazine and that he never had a "firm deal" with Profeta. (DSUMF ¶¶22-23; PRS ¶23; Read Dep. II at 301:25-302:2). Read and Profeta never executed a contract for the project or agreed on a mutually acceptable business structure. (DSUMF ¶24; PRS ¶24; Read Dep. II at 239:16-20). Nevertheless, Read testified, Profeta was enthusiastic about launching *The Downtowner*, "thought the time was right," and told Read "on more than one occasion [that] this is going to happen now." (DE 64-3, Read Dep. I at 54:21-24; PSMF ¶30).[12]

---

[12] Read does not provide much detail to substantiate Profeta's comments. (*See* DE 64-3, Read Dep. I at 54:21-24; PSMF ¶30). Where Read has supported his allegations with some supporting detail, however minimal, they have been incorporated in this opinion. I note that Read has generally alleged in his opposition that Profeta "continued to give the Plaintiff 'assurances that kept us moving forward.'" (PSMF ¶89). Those additional assurances, however, are not identified with any specificity.

To defeat summary judgment, a plaintiff must go beyond unsupported allegations and support each essential element with concrete evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-23 (1986); *see Hargrove v. Cnty. of Atl.*, 262

Read did not tell Profeta that any information he had disclosed about his magazine concept was secret. (Read Dep. II at 196:6-9; DSUMF ¶33; PRS ¶33). Much or most of the information that Read had shared with Profeta he also shared with the other potential backers. (Read Dep. II at 196:1-5; DSUMF ¶¶30, 32; PRS ¶¶30, 32). Read's research regarding his platform was disclosed to everyone "who asked." (DSMF ¶34; PRS ¶34).[13]

### 3.    *Profeta Publishes* Radius[14]

Read admitted that he and Profeta had no agreement that would have prohibited Profeta from launching his own magazine. (DSUMF ¶50; PRS ¶50). In the fall of 2013, Profeta did launch a magazine called *Radius: Brick City and Beyond.* (DSUMF ¶51; PRS ¶51). *Radius* used a freelance business model.[15] It was Profeta's first experience with printed media. (PSMF ¶48; Profeta Dep. at 46:20-47:13).

According to the *Radius* website, the mission of *Radius* was "to provide a positive antidote to the numbing, distorted, depiction of Newark printed daily in the *Star-Ledger*. Radius tried to suggest what was positive and fun about returning to Newark." (PSMF ¶4; DE 71-7, Ex. D, Paul V. Profeta, *Letter from the Publisher – Summer 2016*, Radius: Brick City and Beyond (May 26, 2016)). In his "Letter from the Publisher," Profeta states that before he "began to publish *Radius*," he "canvassed the anchor institutions of Newark before

---

F. Supp. 2d 393, 418 (D.N.J. 2003) ("It is well settled that ... speculations, generalities, and gut feelings, however, genuine, when they are not supported by specific facts" are insufficient to defeat summary judgment.). "In deciding a motion for summary judgment, the court considers the competent evidence presented and need not credit Plaintiff's bald, unsupported allegations." *See Bumbarger v. New Enter. Stone & Lime Co.*, 170 F. Supp. 3d 801, 832 (W.D. Pa. 2016).

[13]    Profeta testified that he returned the documents that Read provided to him for the magazine, except for a thumb drive, which was lost. (Profeta Dep. at 75:1-10; *see* PSMF ¶51).

[14]    Radius, LLC, the entity, has been incorrectly sued as "*Radius: Brick City and Beyond*," the name of the magazine. (DE 70-3, ¶1, Declaration of Paul Profeta).

[15]    Read claims that *Radius* published its first issue in August of 2013 but fails to cite to the record for that fact. (PSMF ¶73). Similarly, Read claims that *Radius*'s offices are located in a Berson-owned building, without a citation to the record. (PSMF ¶75).

assuming a financial endeavor like this one." (PSMF ¶5; DE 71-7, Ex. D).
Profeta testified that *Radius* was mailed to people in the suburbs, while *The Downtowner* was going to be distributed for free in downtown locations. (Profeta Dep. at 83:9-11).

        4.    *Read's Damages*

Many other municipalities have city-centric magazines. (DSUMF ¶37; PRS ¶37; Read Dep. II at 304:1-205:20). Read alleges, however, that Profeta took his idea for a Newark-centric magazine and used "the people" that Read had lined up as advertisers. (Read Dep. II at 212:20-25; PRS ¶38; PSMF ¶43).[16] When asked how Profeta was "enriched," as alleged in his complaint, Read testified that it perhaps was Profeta's "ego" that was enriched. He acknowledged that Profeta's magazine, *Radius*, was not a financial success. (Read Dep. II at 68:17-22). Read further indicated that "no magazine really" has data that would enable a person "to quantify the return on investment." (Read Dep. I at 15:18-21).

Read asserts that he is entitled to $300,000 in damages. (Read Dep. II at 120:3-122:1). That number includes a notional six-figure yearly salary of $109,000 for two years.[17] The two-year period represents the time Read spent

---

[16]    Read asserts that "On the Founder's Page, listed were Genova Burns Giantomasi and Marc Webster, Marc Berson's Fidelco, Brick City Development Corp., MCJ Amelier Foundation, and Rutgers Business School, persons or entities with whom the Plaintiff had made connections (DeZao Decl., Exhibit W) (Vol. II, 114:17 - 115:10)." This citation to Read's deposition testimony, however, only establishes that Read met with these individuals, not that they had agreed to buy ads or be listed on *Radius*'s founders page. (*See id.*). Read does not otherwise identify any specific advertisers Profeta allegedly took for *Radius*. Read argues throughout his briefing that Profeta used the "same investors" that Read had cultivated. That statement, however, is unsupported by any citation to the record.

    Read did testify that he had "lined up" advertisers for *The Downtowner*. (PSMF ¶82; Read Dep. II at 95:17-93:3). However, Read then clarified that that these were only "prospective" or "potential" advertisers, and that they had not actually entered into any agreements. (Read Dep. II 96:96:9-21). "Lining up" prospects is not the same as actually selling advertising space. As stated above, Read testified that the most he actually accomplished was "an informal 6-month commitment" from Rutgers Business School. (PSMF ¶23; DE 71-20).

[17]    Read indicated that he earned $93,000 per year at the *Star-Ledger*. (Read Dep.

"pitching his idea to anyone in Newark who would listen."[18] (DSUMF ¶46(c);

---

II at 192:12-17). Regarding his proposed salary, Read testified as follows:

> Q. Mr. Read, in your damage calculation, you came up with $109,000, right?
>
> A. I rounded 100,000 a year I think, six figures.
>
> Q. You told me $109,000.
>
> A. That's how much --
>
> Q. That's what you testified to under oath, right?
>
> A. Correct.
>
> Q. But your last year at the Star Ledger you were only making $93,000, right?
>
> A. Correct.
>
> Q. Why didn't you choose $93,000?
>
> A. I chose six figures, meaning $100,000, which is less than 109 but more than 93.
>
> Q. You weren't making $100,000 your last year at the Star Ledger, right?
>
> A. That's correct.
>
> Q. Did Mr. Profeta tell you to quit the Star Ledger?
>
> A. No.
>
> Q. Did you rely upon anything relating to Mr. Profeta to leave your job at the Star Ledger?
>
> A. No.
>
> Q. Did Mr. Profeta talk to you about the DownTowner when you left the Star Ledger?
>
> A. Yes.
>
> Q. And you didn't leave the Star Ledger because of Mr. Profeta or the DownTowner, correct?
>
> A. That's correct.
>
> Q. And that was in 2010?
>
> A. Correct.

(Read Dep. II at 129:3-130:9).

[18]  Read seems to be referring to the period from December 2010 until discussions with Profeta broke down in January 2013, a period during which he was pitching the project to other investors and Profeta. This, then, is not a "Class A" claim for his salary as editor of the *Downtowner* if had been launched; it must be a "Class B" claim that his entrepreneurial efforts to launch the magazine should for some reason be compensated at the rate approximated by his prior salary at the *Star-Ledger*. It

PRS ¶46(c)).

Read further claims that he is entitled to recover expenses for the time he spent developing *The Downtowner*. (DE 71-5, at 7, Plaintiff's Answers to Defendants' First Set of Interrogatories, ¶7). When asked how much money Read believed Profeta owed him for his efforts, Read testified "I could only look at it in terms of my investment in time and the significant expenses I took to stay in place to put these pieces together under Mr. Profeta's direction." (Read Dep. I at 49:18-21). Such expenses, he says, involved the liquidation of $20,000 in a mutual fund, $31,000 in trust money from his mother, and cashing out his 401(k), in the amount of $75,000. (Read Dep. II 121:9-18; PSMF ¶81). Read used the $75,000 to pay his mortgage. (Read Dep. II at 148:22-23). He used the $20,000 to pay for other living expenses. (Read Dep. II at 149:5-9). Read used the $31,000 for his family's expenses. (Read Dep. II at 150:2-6). There is no claim that Profeta committed to pay such living expenses, or that they would not have been incurred but for something Profeta said or did. Nor is there any indication that these expenses were incurred in the period after mid-2012, the earliest time that, even by Read's own account, he had an "agreement" with Profeta.

Read believes that he was "hired" in 2012 and that he "worked for" Profeta. (Read Dep. I at 50:4-51:52:2). Read admitted that he did not have an employment contract with Profeta, and that the parties never agreed upon a salary. (DSUMF ¶25-26; PRS ¶26; DE 64-3, Read Dep. I at 46:10-12, 51:16-24). Nonetheless, Read says he expected to be paid by Profeta. (PSMF ¶35).

Read did not keep track of the hours that he claims to have expended, never told Profeta he would be charging for his time, and did not submit claims for expenses to Profeta. (Read Dep. I at 52:6-8; Read Dep. II at 208:16-209:19;

---

amounts to a claim that Profeta did hire him or should have hired him (and picked up his living expenses) to develop the magazine concept—indeed, that Profeta should have been paying Read to pitch the concept to *other* investors—starting in about December 2010. I fail to see any basis for this claim; Read himself elsewhere claims, at best, that Profeta in effect "hired" him in mid-2012. (Read Dep. I at 50:4-51:52:2).

DSUMF ¶45; PRS ¶45). Read admitted that his investment of time and expenses is "subjective" and is "open to anyone's interpretation." (DSUMF ¶48; PRS ¶48). Read's answers to interrogatories state that he "invested literally hundreds of hours to the project over two years, which he [estimates] to be worth approximately $200,000." (DE 71-5, at 7). It is unclear how Read came up with this figure. (*See id.*; PSMF ¶66).

Read claims that he focused all his time on developing the magazine to the exclusion of other employment opportunities. (PSMF ¶¶57-58; DE 71-5, at 10-11). Read recalled that he got "a tip" about a job opening at "NJ BIZ," but felt there was no reason to abandon the project for a full-time job. (*Id.*).

Read has since started a freelance-style city magazine in Wake Forest, North Carolina, with no employees and no office. (DSUMF ¶52; PRS ¶52; PSMF ¶78).

### B. Facts Presented in Read's Motion for Summary Judgment[19]

*Radius* was published from November 2013 to June 2017, when it was shut down for "lack of profitability." (DE 65-10, Defendants' Answers to Interrogatories, ¶15; PSMF ¶8; DRS ¶8). *Radius* never made a profit; it lost over $500,000. (DE 65-10, Defendants' Answers to Interrogatories, ¶16).

Profeta's counterclaims allege that Read engaged in a "campaign of callousness" that was "designed to defame and destroy" *Radius*. (PSMF ¶9; DRS ¶9). Profeta claims that Read began to falsely communicate to third parties that Profeta had stolen his business plan and magazine concept. (PSMF ¶10; DRS ¶10). Profeta further alleges that Read communicated with *Radius*'s funding sources, including certain advertisers, that *Radius* is based on a "stolen" magazine concept, which impaired *Radius*'s ability to raise funds for its continued operation. (PSMF ¶13; DRS ¶13). Profeta claims that he had a reasonable expectation that he would have obtained funding from these

---

[19]     The first twenty-five paragraphs of Read's Rule 56 statement of undisputed material facts recite the allegations of Profeta's counterclaim. (PSMF ¶¶1-25). Read then regurgitates this Court's opinion on Read's motion to dismiss Profeta's counterclaims. (PSMF ¶¶26-30).

sources, but due to Read's conduct, was unable to do so. (PSUMF ¶14; DRS ¶14).

During the course of this litigation, Read propounded written discovery requests to Profeta, and asked Profeta to "set forth in detail your factual allegations" in support of his counterclaim against Read. (DE 65-10, Interrogatory ¶18). In Profeta's November 15, 2017 certified responses, he incorporated the general allegations set forth in his counterclaim and provided no further detail. (*Id.*). In response to a discovery request regarding damages, Profeta simply asserted that he "sustained special damages and incurred legal fees." (*Id.* at ¶18; PSUMF ¶33).

On February 7, 2018, plaintiff's counsel requested more specific answers and, in particular, requested a more specific answer to Interrogatory No. 18. (DE 65-11). On February 16, 2018, defense counsel responded only that the "amount of special damages if awarded are within the discretion of the court and jury to be determined by them." (DE 65-11; PSUMF ¶35).

Plaintiff's counsel sent another deficiency letter on February 23, 2018. (DE 65-12; DE 74-2, ¶6; DE 74-5). The letter stated that the response to Interrogatory No. 18, even as amended, was deficient in that Profeta failed to provide "any" factual bases for the counterclaims or his calculation of damages. (DE 74-5, at 3). Read requested confirmation that Profeta did not have any "actual" damages. (DE 74-5, at 3).

On February 27, 2018, Profeta "supplemented" his discovery responses, and attached an April 15, 2015 article that was published by the *Star-Ledger*. (DE 65-12; DE 74-6). This article was a supplementation to Interrogatory No. 18. (DE 74-6). Profeta asserted that this article was "an item of special damages" that "damaged Mr. Profeta's reputation in the community." (*Id.*). Defendants further asserted that they believed that Read had "been provided with more than enough information to go forward with a deposition of Mr. Profeta." (*Id.*).

The article is titled "Former Star-Ledger reporter files suit, claims N.J. bizman stole his magazine idea." (*Id.*). Written by Thomas Zambito, the article recited the allegations of Read's complaint, noting that all of the facts presented in the article were "according to the lawsuit" or consisted of what "Read claims" in the lawsuit. (*Id.*).

Profeta testified that after the article was published, he called Zambito. (Profeta Dep. 14:18-16:19; PSUMF ¶50; DRS ¶50). Zambito told Profeta that the article was "planted" by Read, which Profeta took to mean that Read wrote the article. (PSUMF ¶¶52, 54; DRS. ¶¶52, 54). Zambito told Profeta that Read was his friend, and that Read had previously sued "wealthy people," including S.I. Newhouse,[20] the publisher of the *Star-Ledger*. (Profeta Dep. 19:4-20:9).

Profeta spoke about the article with "Rutgers people," including the Chancellor of Rutgers-Newark, Gene Vincenti.[21] (Profeta Dep. at 25:23-26:23). Profeta "thought they mentioned the article to me," and Profeta told them that the article had been planted by Read. (*Id.*; PSUMF ¶58; DRS ¶58).

Giantomasi told Profeta that he thought the article was "unfortunate." (PSUMF ¶60; DRS ¶60; Profeta Dep. at 28:2-16). Berson told Profeta that "It's sad that you got slandered like this." (Profeta Dep. at 29:20-30:11). Profeta could not recall speaking with anyone else about the article. (PSUMF ¶64; DRS ¶64).

In opposition to Read's motion for summary judgement, Profeta has submitted a declaration, which Read has moved to strike. (DE 70-3 (Oct. 22, 2018 Profeta Declaration (hereinafter "Profeta Decl."))). Profeta states in that certification that after the launch of *Radius*, "Read began to communicate falsely to third-parties that I had 'stolen' his business plan and magazine concept in an effort to forestall *Radius*' success and decimate its ability to turn a profit." (Profeta Decl. ¶6; DSMF ¶5). Profeta further states that Read

---

[20] The reference may be to Advance Publications, founded by S.I. Newhouse, Sr., which owns Condé Nast, the *Star-Ledger,* and other publications.

[21] Profeta stated that he also spoke to the assistant chancellor, whose name he could not recall. (Profeta Dep. at 26:6-9).

communicated "falsely to *Radius*' funding and advertising sources, including many of *Radius*' 'Founders,' that *Radius* was based upon Read's 'stolen' magazine concept." (Profeta Decl. at ¶6). He claims this impacted *Radius*'s ability to raise funds. (*Id.*). Profeta claims that he "heard from marketing people with several of *Radius*' advertisers that the executives in the companies" were disappointed in Profeta for "stealing" Read's idea. (Profeta Decl. ¶8).

Regarding these factual assertions, Profeta does not identify (1) the third parties; (2) what Read actually said; (3) when Read made these statements; (4) how Profeta knows what Read said to other third parties; or (5) the identity of the funding or advertising sources, or "Founders."

During his deposition, Profeta identified the following individuals as persons with knowledge of his counterclaims: Steven Coleman; Phil Read and his son; Bob Bogert; and Zambito. (Profeta Dep. at 10:23-11:25). These were the only individuals that Profeta could "recollect" at the time. (Profeta Dep. at 11:25).

Profeta claims that the following companies discontinued their advertisements with *Radius*: Commercial Mortgage, Cook Maran, Dr. Boiardo/CarePoint, ECC, Flemington Car & Truck Country, Genova Burns Giantomasi & Webster, Hollister Construction, Hehl & Hehl, J.P. Morgan, Korman, McElroy Deutch Mulvaney & Carpenter, MCJ Amelier - My Brother's Keeper, PUIF, St. Michael's Hospital, United Energy Consultants, Van Cleef, and Verizon. (Profeta Decl. ¶9; PSMF ¶8). Profeta claims that each of these advertisers had previously paid $4,000 per quarter in advertising. (PSMF ¶9; Profeta Decl. ¶9). He does not, however, proffer additional facts linking the loss of these advertisers to defamatory statements by Read.

Read objects to the majority of Profeta's declaration, claiming that Profeta's assertions are based on hearsay, lack a sufficient foundation of personal knowledge, and violate discovery rules. (*See* PRS ¶¶ 4-9, 12).

### C. Procedural History

On April 14, 2015, Read initiated this action against Profeta, Steven Coleman, William Kohn, Paul V. Profeta & Associates, and *Radius: Brick City & Beyond*. (DE 1). On April 15, 2016, the Court granted in part and denied in part the defendants' motion to dismiss the complaint. (DE 23, 24). On May 10, 2016, Read filed an amended complaint asserting fourteen counts: theft of intellectual property (count 1); fraud (count 2); interference with a prospective economic advantage (count 3); promissory estoppel (count 4); breach of an implied covenant of good faith and fair dealing (count 5); conversion (count 6); breach of contract (count 7); negligence (count 8); gross negligence (count 9); unjust enrichment (count 10); quantum meruit (count 11); breach of fiduciary duty (count 12); equitable fraud (count 13); and injunctive relief (count 14). (DE 25).

On June 21, 2016, defendants filed an answer and counterclaim against Read. (DE 30). On January 11, 2017, the Court granted in part and denied in part Read's motion to dismiss the counterclaim. (DE 39). Defendants filed an amended counterclaim on January 27, 2017. (DE 41). Count 1 of the counterclaim, which alleged abuse of process, was dismissed with prejudice on consent. (DE 55, at 4). Read's motion to dismiss the amended counterclaim was otherwise denied. The remaining counterclaims against Read are as follows: tortious interference with prospective economic advantage (second count); defamation and slander (third count); tortious interference with contractual relations (fourth count); false light (fifth count); and trade libel (sixth count). (DE 41).

On January 4, 2018, pursuant to the parties' stipulation, defendants Steven Coleman, William Kohn, and Paul V. Profeta and Associates were dismissed from the case. (DE 59).

Fact discovery was completed on July 31, 2018. (DE 63). The Court's order directed "the resolution of certain objections by Plaintiff to responses to written discovery and the deposition of Defendant Profeta" to be completed by that date and directed the parties to "meet and confer regarding Plaintiff's

objections to written discovery responses." *Id.* Any remaining disputes were to be submitted to the Court by letter on or before June 7, 2018. *Id.* No such letter was received by the Court.

On September 14, 2018, Profeta and *Radius* moved for summary judgment on Read's claims (DE 64) and Read moved for summary judgment on defendants' counterclaims (DE 65). Each party opposed the other's summary judgment motion. (DE 70, 71).

Read has also moved for sanctions and to strike Profeta's declaration in opposition to Read's motion for summary judgment. Defendants have opposed that motion. (DE 72, 74).

## II. Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex*, 477 U.S. at 322-23. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party

must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### III.   Defendants' Motion for Summary Judgement

#### A. Contract Claims

Defendants move to dismiss Read's contract claims (Counts 5 and 7). They assert that the essential terms of a contract, including price and duration, were never agreed to by the parties or even sufficiently defined. (DSJBr at 13-16). It is undisputed that there was no express contract. The plaintiff claims, however, that there was a contract implied in fact.

A "contract implied in fact 'is in legal effect an express contract,' and varies from the latter only insofar as the parties' agreement and assent thereto have been manifested by conduct instead of words." *Saint Barnabas Med. Ctr. v. Cnty. of Essex*, 111 N.J. 67, 77 (1988) (citation omitted); *see Baer v. Chase*, 392 F.3d 609, 616 (3d Cir. 2004) ("The distinction between express and implied contracts rests on alternative methods of contract formation.") (citing *In re Penn. Cent. Transp. Co.*, 831 F.2d 1221, 1228 (3d Cir. 1987) ("An implied-in-fact contract, therefore, is a true contract arising from mutual agreement and intent to promise, but in circumstances in which the agreement and promise have not been verbally expressed. The agreement is rather inferred from the conduct of the parties.")).

An implied contract "must be sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty." *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1984) (citations and internal quotations omitted).[22]  Courts will, if possible, "attach a sufficiently definite meaning to the terms of a bargain to make it enforceable," *Paley v. Barton Savings and Loan Assoc.*, 82 N.J. Super. 75, 83 (App. Div. 1964), and in doing so may refer to "commercial practice or other usage or custom." *Lynch v. New Deal Delivery Serv. Inc.*, 974 F. Supp. 441, 458 (D.N.J. 1997).

"For a contract to be enforceable there must be a meeting of the minds for each material term to an agreement." *In re Rappaport*, 517 B.R. 518, 529 (Bankr. D.N.J. 2014) (internal quotations and citations omitted). The

---

[22]      The parties do not dispute that New Jersey law applies.

requirements of a meeting of the minds "is 'an essential element to the valid consummation of any contract.'" *Id.* at 530 (quoting *Ctr. 48 P'ship v. May Dep't Stores Co.*, 355 N.J. Super. 390, 406 (App. Div. 2002)). This requirement is met when "there has been a common understanding and mutual assent to all the terms of a contract." *Id.* (citation and quotation omitted). An implied-in-fact contract is "unenforceable for vagueness when its terms are too indefinite to allow a court to determine with reasonable certainty what each party has promised to do." *Lynch*, 974 F. Supp. at 457.

Assuming an offer contains definite terms, there must also be "'an unqualified acceptance to conclude the manifestation of assent.'" *Weichert Co. Realtors*, 128 N.J. at 435-36 (quoting *Johnson & Johnson v. Charmley Drug Co.*, 11 N.J. 526, 539 (1953)). Manifestation of assent may be communicated through oral or written communication, or through conduct. *Id.* at 436. "Like express contracts, contracts implied in fact depend on 'mutual agreement and intent to promise.'" *Saint Barnabas Med. Ctr.*, 111 N.J. at 77.

Read asserts that the parties' conduct created an implied-in-fact contract. The parties "agreed," he says, that Read would work for defendant "on a salary, along with the Plaintiffs staff." (PBr at 9). In Read's telling, "Plaintiffs documents and testimony" establish that there is at least a triable issue of fact as to whether a contract was formed.

I disagree and will grant defendants' motion for summary judgment on the claims of breach of contract and breach of the implied covenant of good faith and fair dealing. This record unambiguously demonstrates a course of negotiations that never took shape as an agreed-upon, definite, and enforceable contract. There is no evidence that Profeta, by words or conduct, agreed to pay Read a salary or fund his proposed magazine. Neither the terms themselves, nor the alleged acceptance-by-conduct of such terms, ever attained the requisite clarity.

Read approached Profeta in November of 2010 with an idea to launch a magazine. Between that first discussion in November 2010, and the cessation

28

of the initial discussions in early 2011, Profeta did no more than ask Read for more information about the costs related to launching a magazine. At no point did Profeta expressly or implicitly agree to pay Read a salary.[23] *See Flemming v. Ronson Corp.*, 107 N.J. Super. 311, 315 (Law Div. 1969), *aff'd o.b.*, 114 N.J. Super. 221 (App. Div. 1971) (finding parties never had a meeting of the minds and no contract was formed when "all that [could] be derived" from parties' course of conduct was an invitation from defendant to plaintiff to submit an idea, defendant requested additional details of idea, defendant "did not promise to pay for the mere submission of an idea," and after receipt of information from plaintiff of additional information, defendant stated it was not interested in idea).

Read told Profeta that he wanted to hire editors, an advertising salesperson, an artist, and an editorial page designer. That might *arguendo* be construed as an offer, although it seems more exploratory than definite. Be that as it may, there is no evidence that Profeta accepted that offer in 2010–11. Indeed, the parties ceased their discussions and Read sought other potential financial backers, until he re-approached Profeta over a year later.

I turn to those resumed discussions, beginning in July 2012 and extending through January 2013. In those months, Read continued to supply information to Profeta about his proposed magazine and at times responded to Profeta's requests for more information. A request for more information, however, falls far short of an agreement or a meeting of the minds on the material terms of a contact.

On July 18, 2012, for example, Read told Profeta that certain staff, including himself, would need health benefits. There is no evidence that Profeta agreed or even responded to this request. On August 9, 2012, Read proposed a

---

23    Read's briefing is not entirely clear as to whether he was expecting a salary for the work that he did in preparing the concept of *The Downtowner* or was expecting a salary as editor once it was launched. That lack of clarity is emblematic of the problem with the contract claims: even Read cannot seem to articulate what the terms of the agreement were supposed to be. Either claim would fail, in any event, for lack of a reasonably clear agreement between the parties.

"Plan B" for the magazine, which would reduce the number of issues per year and require the staff to accept reduced salary levels. Again, the record is devoid of any evidence that Profeta agreed to either Plan A or Plan B, or agreed to fund either option.

It was not until September 10, 2012, that Profeta even broached the idea of funding the entire venture. However, Profeta's offer to fund the magazine was premised on an important condition that was never met: that the parties could come together on a "mutually agreeable business structure." The parties had discussions back-and-forth about the business structure, but never reached agreement on such highly material terms as whether there would be an office and salaried employees.

On September 26, 2012, in response to a request from Profeta, Read provided a breakdown of expenses. (PSMF ¶21). Read also provided an Executive Summary, which included proposed staffing levels for the magazine. (DE 71-19). Again, neither of these events suggest that Profeta *agreed* to Read's proposal. At best, they constitute due diligence by Profeta and Read's continued attempts to convince Profeta to back his idea.

On October 5, 2012, Read raised the possibility of being a minority stakeholder, stating that he would "like to retain a small minority stake" in recognition of his having developed the idea. (PSMF ¶23; DE 71-20). Read says he believes that he and Profeta were partners. (PSMF ¶84; Read Dep. II at 109:10-20). All this evidence shows, however, is that Read *asked* to be a partner.

On October 9, 2012, Read sent another email to Profeta, expressing his hope that they would set up a business structure by the end of the month. (DE 71-21). Profeta replied that he would not fund the venture until there were "at least 40 members in the Founder's club." (*Id.*). For all that appears in this record, no person or entity ever actually committed to be a "Founder." *Cf. In re Beltrami*, 324 B.R. 255, 277 (Bankr. M.D. Pa. 2005) ("these comments conveyed nothing more than promises that negotiations would continue . . .

30

and hope that a final agreement would eventually be reached."). Frankly, it remains unclear what "Founder" status was even supposed to consist of.

After inviting Read to the Christmas party, Profeta expressed to Read that while he hoped that the magazine would "launch by [December] 14th," he had "doubts" as to whether that would occur. (DE 71-24).

Read admittedly understood at the time that Profeta was not "100 percent committed" to move forward with *The Downtowner*. (Read Dep. II, at 263:16-20). Read nonetheless testified that he believed that, by mid-2012, he had "an agreement" with Profeta. (Read Dep. II at 196:19-20). Asked to state the terms of the alleged agreement, Read answered that Profeta "was passionate about the magazine and we should go forward, and this was going to happen now, and his CFO was saying I look forward to working with you." (Read Dep. II at 196:21-25; *see also* PSMF ¶38).

All of the foregoing seems more like wishful thinking than classic offer-and-acceptance. These alleged terms, moreover, are too vague to rise to the level of an enforceable contract. By January 2013, the parties' negotiations broke down entirely because they never could agree on a business structure. Among the unsettled issues was whether the magazine would have an office and salaried employees or would be based on a freelance model.

Granting Read every favorable inference, all that can be concluded is that the parties had extended discussions which never resolved into an actual agreement. There was no meeting of minds on important and material terms, and no indication that Profeta manifested assent, by words or conduct, to be bound by Read's proposals. Thus, there is no evidence of an enforceable agreement, and the breach-of-contract claim must fail.

The claim for breach of the implied covenant of good faith and fair dealing must fail as well. Such a covenant is not a standalone agreement, but an implied term *of a contract.* In the absence of an underlying enforceable contract, "there can be no breach of an implied covenant of good faith and fair dealing." *Wade v. Kessler Inst.*, 343 N.J. Super. 338, 345 (App. Div. 2001).

Accordingly, the defendants' motion for summary judgment on Counts 5 and 7 of the complaint will be granted.

### B. Promissory Estoppel

The fourth count of the complaint alleges promissory estoppel. (AC ¶¶92-97). Read alleges that defendants represented to him "that he would be compensated for sharing his ideas and providing his services" and that he relied on those representations to his detriment. (AC ¶¶92-96). Elsewhere, however, Read seems to argue that the "promise" was that he would be hired as a salaried editor of the magazine. Read points to Profeta's comment, after the October 9, 2012 meeting with Berson and Giantomasi, that "it looks like you got your magazine." (PBr at 13-15; DSUFM ¶13; PRS ¶13; Read Dep. II at 263:12-13). This, says Read, was a promise that he would be "put on payroll."[24] Defendants argue that the record fails to demonstrate a sufficiently clear promise that Profeta would pay Read a salary. (DSJBr at 20; DSJRBr at 9-10).

A promissory estoppel claim has four essential elements: "(1) a clear and definite promise by the promisor; (2) the promise must be made with the expectation that it will induce reliance by the promisee; (3) the promisee must reasonably rely upon the promise; and (4) the promisee must experience substantial reliance on the promise." *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 439 (D.N.J. 1997), *aff'd*, 172 F.3d 859 (3d Cir. 1998); *see Toll Bros., Inc. v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 194 N.J. 223, 253 (2008); *Pop's Cones, Inc. v. Resorts Intern. Hotel, Inc.*, 307 N.J. Super. 461, 468-69 (App. Div. 1998). On summary judgment, the plaintiff must demonstrate that the record creates at least a material issue of fact as to those elements.

At issue here is the first essential element, "an express promise between the promisor and promisee." *Burton Imaging Grp. v. Toys "R" Us, Inc.*, 502 F.

---

[24]     Read's briefing suggests that Profeta told Read that he "would be on salary within months or even days." (PBr at 13). There is no evidence in the record that Profeta actually made such a statement to Read. (*See* Section I.A.1-3, *supra*). Read may be referring to his own November 7, 2012 email to his staff, wherein *Read* stated that Profeta had told him that the magazine was going to happen, possibly in thirty days, and that the staff would be on payroll by January 1. (PSMF ¶55; DE 71-28).

Supp. 2d 434, 439 (E.D. Pa. 2007). "A 'broad or vague implied promise' will not suffice." *Id.* (quoting *C & K Petroleum Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988) (implied promise by bank to "administer the main checking account . . . in the normal, banking fashion" too vague for promissory estoppel claim)).

Such "done deal" expressions of fact or intent "do not constitute a sufficiently definite promise." *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1250 (3d Cir. 1989) (statement of the defendant's intent to sell back stock on a basis equal to all other stockholders not sufficiently definite); *Alexander*, 991 F. Supp. at 439 ("[A] 'truthful statement as to the present intention of a party with regard to future acts is not the foundation upon which an estoppel may be built. The intention is subject to change." (citation omitted)); *Landan v. Wal-Mart Real Estate Bus. Tr.*, 2016 U.S. Dist. LEXIS 129481, at *31 (W.D. Pa. Sep. 22, 2016) ("In the context of the ongoing negotiations and the closing that consistently was not scheduled, the statements of a done deal or that a closing and executed documents would be forthcoming were at best vague and aspirational."); *cf. 168th & Dodge, Ltd. P'ship v. Rave Reviews Cinemas, Ltd. Liab. Co.*, 501 F.3d 945, 956-57 (8th Cir. 2007) (holding that promise of a "done deal" insufficient and unenforceable).

Counsel for Read relies on two cases in support of his position that there was a definite promise: *Pop's Cones, supra*, 307 N.J. Super. 461, and *Peck v. Imedia, Inc.*, 293 N.J. Super. 151 (App. Div.), *certif. denied*, 147 N.J. 262 (1996). I briefly address them.

In *Pop's Cones*, the plaintiff ran a frozen yogurt business on the Atlantic City boardwalk. The plaintiff and the defendant negotiated about the possible relocation of the plaintiff's business to a space owned by the defendant. The defendant offered significant inducements to encourage the plaintiff's interest in moving to that site. 307 N.J. Super. at 464. The plaintiff made a written offer to lease the new site, stating that it needed a timely response, because the renewal date of its current lease was approaching. *Id.* at 464-65.

In response, the defendant assured the plaintiff that it would have "little difficulty in concluding the agreement"; more importantly, the defendant explicitly advised the plaintiff to give notice to its landlord that it would not be extending its present lease, to "pack up [its] store," and to "plan on moving." *Id.* at 465. In reliance on those assurances, the plaintiff gave notice to its landlord, moved its equipment into temporary storage, sent designs for its new store to its franchisor, and retained an attorney to finalize the new lease with the defendant. *Id.* Thereafter, the defendant withdrew its offer to lease the space to the plaintiff. *Id.* at 466-67. The trial court granted summary judgment to the defendant. *Id.* at 468.

On appeal, the New Jersey Appellate Division surveyed the existing jurisprudence, and recognized that one of its prior decisions seemed to have imposed a "heightened the amount of proof required to establish a 'clear and definite promise' by searching for 'an express promise of a 'clear and definite' nature." *Id.* at 469 (quoting *Malaker Corp. Stockholders Protection Comm. v. First Jersey Nat'l Bank,* 163 N.J. Super. 463, 484 (App. Div. 1978) (holding that bank's oral promise in October 1970 to lend $150,000 for January, February and March of 1971 was not "clear and definite promise" because it did not describe a promise of "sufficient definition."), *certif. denied,* 79 N.J. 488 (1979)). *Pop's Cones* recognized that the Appellate Division's language in *Malaker* "suggest[ed] that New Jersey Courts expect proof of most, if not all, of the essential legal elements of a promise before finding it to be 'clear and definite.'" *Id.*

*Pop's Cones* noted that more recent decisions, however, had "tended to relax the strict adherence to the *Malaker* formula for determining whether a *prima facie* case of promissory estoppel exists." *Id.* The Court carefully pointed out that the plaintiff was not claiming the benefit of a contractual bargain; rather, the plaintiff claimed damages already occasioned by the surrender of its prior location. *Id.*

In reversing the grant of summary judgment, the Appellate Division held that relaxation of the "clear and definite proof" standard was particularly appropriate "where, as here, a plaintiff does not seek to enforce a contract not fully negotiated, but instead seeks damages resulting from its detrimental reliance upon promises made during contract negotiations despite the ultimate failure of those negotiations." *Id.* at 469-70.

I turn to *Peck,* in which the court found a sufficiently clear and definite promise. 293 N.J. Super. at 165-68. There, an at-will employment offer letter contained the position title, a "detailed position description . . . as well as information on . . . benefits," and an annual salary. *Id.* at 156 (internal quotation marks omitted). The court determined the offer was a "clear and definite promise" of employment for purposes of promissory estoppel. *See id.* at 165-68.

At least as to what I have called "Class B" claims (*see* p. 2, *supra*), then, *Pop's Cones* suggests that Read may claim the benefit of a somewhat relaxed standard of specificity. Still, the claimed promise here does not come close to those recognized in the case law, including *Pop's Cones* and *Peck*. Profeta did not clearly or definitively express that he was either funding the magazine or employing Read to develop the concept. The offer of employment in *Peck*, which was issued by the prospective employer, was detailed and included the position, salary, and benefits. Importantly, the offer was communicated by the defendant in that case. Here, Read articulated, not an offer by Profeta, but his own statements to Profeta stating what he would have liked such an offer to contain. Profeta never came anywhere near agreeing to, for example, a particular salary or benefits package.[25] Nor did Read's reliance approach that

---

[25]    I set aside the difficulty that the venture itself, which Read says was supposed to be his employer, never got off the ground. For example, Profeta emailed Read that he was considering funding the venture, but only subject to a positive outcome of his due diligence and a mutually agreeable business structure. Read testified, however, that he relied upon this as an "assurance" that Profeta was considering funding the magazine. (Read Dep. II at 243:15-25).

of the *Pop's Cones* plaintiff, which, at defendant's behest, cancelled its existing least and moved its equipment.

On October 5, 2012, Read raised the possibility of being a minority stakeholder, stating that he would "like to retain a small minority stake" in recognition of his having developed the idea. (PSMF¶23; DE 71-20). Read states that, based on this conversation, he believes that he and Profeta were partners. (PSMF ¶84; Read Dep. II at 109:10-20). This evidence, however, shows only that Read asked to be partner, not the Profeta agreed, promised, or even stated that this would occur. Whatever Profeta might have thought generally about Read's magazine proposal, he was not accepting Read's terms.

After the October 9, 2012 meeting with Berson and Giantomasi, Profeta said "it looks like you got your magazine."[26] The same day as that meeting, Read sent another email to Profeta, expressing his hope that they would set up a business structure by the end of the month. (DE 71-21). Profeta replied that he would not fund the venture until there were "at least 40 members in the Founder's club." (*Id.*). That, too, never occurred.

Read admits that he contemporaneously understood that Profeta was not 100% committed to move forward with the magazine at all. *A fortiori*, Profeta's general statements fell far short of a commitment that the magazine would employ Read. *See Ankerstjerne v. Schlumberger Ltd.*, 155 F. App'x 48, 51 (3d Cir. 2005) (finding multiple statements that plaintiff would get paid, such as assurances that defendant "would get it taken care of" and "it was ridiculous [Plaintiff] had not been compensated" too broad and vague); *see also ProgenyHealth, Inc. v. CareSource Mgmt. Grp., Co.*, 2017 WL 2618879 (E.D. Pa. 2017) (dismissing promissory estoppel claim even though defendants made countless express statements assuring plaintiffs that they would execute a contract and "were working as 'partners' throughout [contract] negotiations.")

---

[26]    Read has not proffered what happened in this meeting that led Profeta to say, "it looks like you got your magazine." When asked if Profeta had made this statement, Profeta answered that "we were all hoping to launch something, so we spoke optimistically." (Profeta Dep. at 108:17-18).

Similarly, Read's testimony that Profeta was "passionate" about the magazine and said "we should go forward" is too indefinite to support a promissory estoppel claim. *See Burton Imaging Grp.*, 502 F. Supp. 2d at 439 (holding that "we're going to move ahead with you" was too "broad or vague" to maintain promissory estoppel claim for a contract to provide advertising technology); *Universal Atl. Sys. v. Honeywell Int'l, Inc.*, 2018 U.S. Dist. LEXIS 62022, at *20 (E.D. Pa. Apr. 12, 2018) (dismissing promissory estoppel claim based on statement "You can be assured that you will be part of this development.").

After Read received the Christmas party invitation, Profeta again expressed to Read that while he hoped that the magazine would "launch by [December] 14th," he had "doubts" that that would be the case. (DE 71-24).

These undisputed facts make clear that while Read advocated his idea, Profeta did not promise that he would fund this venture or pay Read as an employee, either in the interim or after the magazine launched. The statements Profeta did make were predictive, vague, and hedged by conditions. Profeta's responses made it clear that he had made no commitment and was performing ongoing due diligence.

Truly without a shred of foundation is Read's "Class B" claim that Profeta in effect "hired" him to develop the magazine in a period of approximately two years running from December 2010 through January 2013. Read states that he was entitled to a salary of $109,000 per year, plus compensation for his living expenses. That two-year period, remember, encompasses the initial, abandoned discussions, as well as approximately sixteen months (January 2011 until July 2012) during which Read was pitching the magazine to investors other than Profeta. Read himself can't seem to keep the claim straight; most often he claims he was "hired" not in December 2010, but in mid-2012, or possibly in October 2012. At any rate, the annual "salary" figure of $109,000 appears to be wholly invented. Read points to no act or statement by Profeta suggesting a commitment to pay that or any salary, let alone living expenses. (*See* discussion at pp. 28-31, *supra.*)

In sum, the claimed promises cited here are too uncertain and contingent to be enforced *via* promissory estoppel. Therefore, summary judgment will be granted on Read's promissory estoppel claim (Count 4).

### C. Breach of Fiduciary Duty

Read's breach of fiduciary duty count (Count 12) alleges that the parties "established a joint venture." (AC ¶139). The count claims that as part of the joint venture, Profeta would "front the start-up costs, with the Plaintiff retaining his minority stake"; Profeta "would set up the LLC, with him as publisher and the Plaintiff as editor/associate publisher"; and Read would handle all the editorial issues. (AC ¶¶141-42, 144). Read claims that Profeta breached the duty of loyalty and reasonable care by profiting from, and usurping, Read's ideas.[27]

Defendant move for summary judgment on this claim on the basis that there is no evidence of a joint venture. (DSJBr at 24-25).

"Claims for breach of fiduciary duty require: 1) the existence of a fiduciary duty or relationship between the parties; 2) breach of that duty; and 3) resulting damages." *Starland v. Fusari*, 2015 U.S. Dist. LEXIS 132446, at *16 (D.N.J. Sep. 3, 2015). With respect to the first element, "[t]he essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position. A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship."

---

[27]    Read's opposition to defendants' motion on this claim, however, focuses on unjust enrichment. (PBr at 18-20). Quantum meruit and unjust enrichment are discussed separately at Section III.I, *infra*. I will not permit that concept to be grafted onto this fiduciary claim *via* an argument in a brief. Typically, "arguments raised in passing . . . but not squarely argued, are considered waived." *John Wyeth & Brother Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (citing *Commonwealth of Pa. v. HHS*, 101 F.3d 939, 945 (3d Cir. 1996)); *see also Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("a passing reference to an issue ... will not suffice to bring that issue before this court."); *Kadetsky v. Egg Harbor Twp. Bd. of Educ.*, 82 F. Supp. 2d 327, 334 n.5 (D.N.J. 2000) (finding "casual reference" to a claim results in waiver).

*F.G. v. MacDonell*, 150 N.J. 550, 563-64 (1997) (citing Restatement (Second) of Torts § 874 cmt. a (1979)).

Traditional fiduciary relationships include those between trustee and beneficiary, guardian and ward, agent and principal, attorney and client, corporate director and shareholder, and the members of a partnership. *Avon Bros. v. Tom Martin Constr. Co.*, 2000 N.J. Super. Unpub. LEXIS 1, at *11 (App. Div. Aug. 30, 2000). Fiduciary duties are not imposed in ordinary business transactions. *Alexandra*, 991 F. Supp. at 439 (citing *International Minerals and Min. v. Citicorp, N.A.*, 736 F. Supp. 587, 597 (D.N.J. 1990); *Glenside West Corp. v. Exxon Co., U.S.A.*, 761 F. Supp. 1100, 1116 (D.N.J. 1991) ("no fiduciary relationship exists between franchisors and franchisees under New Jersey law"); *Coca-Cola Bottling Co. of Elizabethtown v. Coca-Cola Co.*, 696 F. Supp. 57, 73 (D. Del. 1988) (a company and their bottlers, "although bound together by their common interest in promoting the sale of Coca-Cola, are arms-length bargaining parties, not partners."), *aff'd*, 988 F.2d 386 (3d Cir. 1993)). "[T]he dominant theme of the case law . . . is that fiduciary relationships arise where one party has the power and opportunity to take advantage of the other, because of that other's susceptibility or vulnerability." *Coca-Cola Bottling Co.*, 696 F. Supp. at 75.

However, "[t]here can be no question that joint venturers owe each other a fiduciary duty." *Lo Bosco v. Kure Eng'g*, 891 F. Supp. 1020, 1033 (D.N.J. 1995); *see also Starland*, 2015 U.S. Dist. LEXIS 132446, at *16 n.4 ("joint venturers owe each other a fiduciary duty because '[t]he relation of joint adventurers ... is fiduciary, one of trust and confidence, calling for the utmost good faith, permitting of no secret advantages or benefits.'" (citation omitted)). A joint venture is "'an undertaking usually in a single instance to engage in a transaction of profit where the parties agree to share profits and losses.'" *Wittner v. Metzger*, 72 N.J. Super. 438, 444 (App. Div.) (quoting *Kurth v. Maier*, 133 N.J. Eq. 388, 391 (E. & A. 1943)), *certif. denied*, 37 N.J. 228 (1962).

A joint venture ordinarily has some or all of the following elements: (1) a contribution by the parties of money, property, effort, knowledge, skill or other assets to a common undertaking; (2) a joint property interest in the subject matter of the venture; (3) a right of mutual control or management of the enterprise; (4) an expectation of profit; (5) the right to participate in profits; and (6) limitation of the objective to a single undertaking. *Id.*

"The *sine qua non* of joint venture is a contract purposefully entered into by the parties. The joint venture is not a status created or imposed by law but is a relationship voluntarily assumed and arising wholly *ex contractu*, express or implied." *Sullivan v. Jefferson, Jefferson & Vaida*, 167 N.J. Super. 282, 289 (App. Div. 1979) (citation omitted); *see Material Techs. v. Carpenter Tech. Corp.*, 2004 U.S. Dist. LEXIS 28892, at *22-23 (D.N.J. Dec. 14, 2004) ("A joint venture is predicated on the same legal event as an employment or partnership contract--an agreement between the parties."). The "basic criterion of a joint venture" is "the voluntary agreement of the parties to form a relationship with the intent to create a joint venture." *Sullivan*, 167 N.J. at 290; *see Read v. Profeta*, 2016 U.S. Dist. LEXIS 51305, at *17 (D.N.J. Apr. 15, 2016) (noting that joint venture is "voluntary agreement of the parties to form a relationship with the intent to create a joint venture.").

It is true that "the joint venture relationship may be less formal" and "may be implied wholly or in part from the acts and conduct of the parties." *Starland*, 2015 U.S. Dist. LEXIS 132446, at *40. "Whether or not the parties to a particular contract have, as between themselves, created the relationship of a joint venture depends upon their intention." *Id.* at 41 (quoting *First Mechanics Bank, v. Commissioner*, 91 F.2d 275, 278 (3d Cir. 1937)). That is, "[f]or a joint venture to have been formed, the parties must have agreed upon the essential terms." *Burnham v. WMC Mortg. Corp.*, 2010 WL 2560667, at *7 (D.N.J. June 21, 2010).

For the reasons set forth above dismissing Read's contract claims for lack of agreement and dismissing the estoppel claim for lack of a promise,

Read's fiduciary claim cannot stand. At best, the record reveals planning and conversations to establish a joint venture. The parties never reached the partnership or quasi-partnership agreement described by Read, who requested a small partnership stake but never received an answer.

Read candidly admitted that he did not have an agreement with Profeta to share profits and losses (Read Dep. II 109:15-20); that he had no "expectation" regarding the allocation of profits and losses (Read Dep. II at 110:105); that the parties never had a firm deal and had not worked out the details for an agreement (Read Dep. I at 54:19-50; Read Dep. II at 197:16-18, 305:14-16); and that the parties never satisfied the condition of agreeing on a business structure. (Read Dep. II at 239:16-20).

Therefore, Read's claim of breach of fiduciary duty (Count 12) is also dismissed.

### D. Fraud and Equitable Fraud Claims

Read's fraud claim (Count 2) alleges that defendants represented to him that they "would work together with him to develop, market, and produce *The Downtowner*." (AC ¶63). Read alleges that Profeta represented that the magazine "would be a joint venture between the [p]arties and that the Plaintiff would be heavily involved in its development and marketing." (AC ¶78). Read claims that the defendants' "actions and/or representations were material and designed to get the Plaintiff to cooperate with them and share ideas and connections so that the Defendants could develop their own magazine without the Plaintiffs' involvement." (AC ¶79). Read's equitable fraud claim (Count 13) repeats the same factual allegations. (AC ¶¶151-170).

Defendants move for summary judgment on these counts on the basis that Read has failed to identify a material misrepresentation. (DSJBr at 16-17).

"Although the word 'fraud" is used in common parlance to connote any practice involving shady or underhanded dealing, in the law it is a term of art with a clear definition." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 175 (2005). To establish fraud under New Jersey law, a plaintiff must prove that "the defendant made (1) a material misrepresentation of present or past fact (2)

41

with knowledge of its falsity (3) with the intention that the other party rely thereon (4) and which resulted in reasonable reliance by plaintiff." *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1182 (3d Cir. 1993); *see Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997).

In addition, "allegations of fraud must be proved by clear and convincing evidence." *Alexander*, 991 F. Supp. at 435 (citing *Vanguard Telecomm., Inc. v. S. New England Tel. Co.*, 722 F. Supp. 1166, 1187 (D.N.J. 1989), *aff'd*, 900 F.2d 645 (3d Cir. 1990); *Fox v. Mercedes-Benz Credit Corp.*, 281 N.J. Super. 476, 484 (App. Div. 1995)). Therefore, to survive summary judgment, "a plaintiff must meet his or her 'burden of coming forward with evidence which could lead a jury to find clear and convincing proof of fraud.'" *Id.* (quoting *Moffatt Enterprises, Inc. v. Borden Inc.*, 807 F.2d 1169, 1174-75 (3d Cir. 1986)).

Of the four elements of fraud, "[m]isrepresentation and reliance are the hallmarks of any fraud claim, and a fraud cause of action fails without them." *Banco Popular N. Am.*, 184 N.J. at 175. An alleged misrepresentation must be premised upon an assertion that is not in accord with the facts. Restatement (Second) of Contracts § 159 cmt. a, c (1981). However, the assertion "must relate to something that is a fact at the time the assertion is made in order to be a misrepresentation. Such facts include past events as well as present circumstances but do not include future events." *Id.* "Indeed, in order to constitute a fact, a statement's content must be susceptible of 'exact knowledge' at the time it is made." *Alexander*, 991 F. Supp. at 435.

"Statements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong." *Id.* (citing *Chatlos Sys., Inc. v. Nat'l Cash Register Corp.*, 479 F. Supp. 738, 748-49 (D.N.J. 1979); *aff'd in part, rev'd in part*, 635 F.2d 1081 (3d Cir. 1980)). Additionally, "statements that can be categorized as 'puffery' or 'vague and ill-defined opinions' are not assurances of fact and thus do not constitute misrepresentations." *Id.* (citing *Diaz v. Johnson Matthey, Inc.*, 869 F. Supp.

42

1155, 1165 (D.N.J. 1994)); *see also Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc.*, 976 F.2d 58, 63-64 (1st Cir. 1992) (holding that defendant's representations concerning commitment to the motorcycle market and future profitability of plaintiff's franchise were opinions of future events and could not be justifiably relied upon as "facts").

"[T]he elements of equitable fraud are similar to that of common law fraud except that scienter, or 'knowledge of the falsity and an intention to obtain an undue advantage therefrom,' is not required." *Carrow v. Fedex Ground Package Sys.*, 2017 U.S. Dist. LEXIS 48536, at *20-21 (D.N.J. Mar. 30, 2017).

Read asserts that a promise to do something in the future, "which the promisor never intended to keep when he made the promise, may satisfy the first element of fraud." (PBr. at 10). That is true enough. "In order to be the basis for an action for fraud, however, the alleged misrepresentation cannot be predicated simply upon a promise to perform that subsequently is unfulfilled." *Lightning Lube*, 4 F.3d at 1186. A plaintiff must prove "that at the time the promise to perform was made, the promisor did not intend to fulfill the promise." *Id.* (citation omitted). "The 'mere proof of nonperformance does not prove a lack of intent to perform.'" *Id.* (quoting *Stochastic Decisions, Inc. v. DiDomenico*, 236 N.J. Super. 388 (App. Div. 1989)).

Read generally alleges that Profeta withdrew from the project "out of the blue" after "he promised the Plaintiff he would be able to start working." (PBr at 11). He further contends that the "timing of" Profeta's rejection of "the business model he and the Plaintiff had agreed upon provides serious questions as to whether Defendant fraudulent[ly] misrepresented his intention of ever hiring the Plaintiff." *Id.*

The fatal flaw in Read's argument, however, is that he does not point to evidence that such a promise was made, let alone withdrawn. Profeta's misgivings about the business model were fairly clear; he certainly never said he would hire Read or fund the venture *even if* they did not agree upon a

43

business model. In addition, Read admitted that he believed that Profeta was being honest with him in their dealings and that Profeta was "actually interested" in working with him on *The Downtowner*. (Read Dep. II at 16-25).

From late 2010 on, Read was gratuitously shopping his proposal to investors, essentially working on spec. The earliest suggestion of any level of potential commitment by Profeta was the September 10, 2012 email, wherein Profeta indicated that he would fund the entire venture pending a positive outcome of his due diligence and a mutually agreeable business structure. Later, he stated that he would need to see at least 40 "Founders" before committing to the venture. To an extent that these could be construed as statements of fact about Profeta's current intent, they were expressly made contingent on events that never occurred.

The record reveals that Profeta's statements to Read, however rosy, were qualified and contingent. Read's own testimony established that he knew Profeta was not entirely committed to funding this venture. Profeta's statements were not actionable, material misrepresentations.

Accordingly, Read's claims of fraud (Count 2) and equitable fraud (Count 13) are dismissed.

### E. Negligence and Gross Negligence

Read's negligence claim (Count 8) asserts that the parties entered into a "business relationship" and as a result of that relationship, defendants "owed him a duty of exercising reasonable care." (AC ¶¶116-17). Read alleges defendants "breached" their duty of care "in making misrepresentations to the Plaintiff with regard to their business-related actions." (AC ¶118). Read's gross negligence (Count 9) claim alleges that defendants owned him a "duty of exercising basic reasonable care in their professional relationship with him," and that defendants breached that duty in developing Read's idea, "earning monies thereon, and failing to compensate him for same." (AC ¶¶121, 123).

Defendants move for summary judgment on these claims on the basis that Read has failed to establish that they owned Read a duty. (DSJBr at 18;

44

DSJRBr at 8). Additionally, defendants argue that Read has failed to identify a negligently-made false statement. (DSJBr at 18).

Read addresses these claims in two sentences in his opposition brief, and simply alleges that there is a disputed fact "as to whether the Defendant owed the Plaintiff a duty not to utilize his idea and work product to their advantage." (PBr at 12).

"[T]o prevail on a negligent misrepresentation claim, a plaintiff must prove that the defendant negligently made an incorrect statement, upon which the plaintiff justifiably relied," which caused economic loss. *Alexander*, 991 F. Supp. at 440 (citing *H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 334 (1983)); *Alin v. Am. Honda Motor Co.*, 2010 WL 1372308, at *13 (D.N.J. Mar. 31, 2010).

While "a fiduciary duty between the parties is not an element of a claim for negligent misrepresentation," a plaintiff seeking to recover for negligent misrepresentation must nonetheless establish that the defendant owed it a duty of care. *Kronfeld v. First Jersey Nat'l Bank*, 638 F. Supp. 1454, 1465 (D.N.J. 1986); *cf. New Jersey Econ. Dev. Auth. v. Pavonia Rest., Inc.*, 319 N.J. Super. 435, 446 (App. Div. 1998) ("a party has no duty to disclose information to another party in a business transaction unless a fiduciary relationship exists between them, unless the transaction itself is fiduciary in nature, or unless one party 'expressly reposes a trust and confidence in the other.'"). "The question of whether a duty exists is a matter of law properly decided by the court, not the jury, and is largely a question of fairness or policy." *Wang v. Allstate Ins. Co.*, 125 N.J. 2, 15 (1991).

"The common law tort of negligent misrepresentation shares all the components of fraud, but includes one additional factor: the misrepresentation must be made by a person with a duty to the plaintiff." *In re Prudential Ins. Co. of Am. Sale Practices Litig.*, 975 F. Supp. 584, 619 (D.N.J. 1996), *rev'd on other grounds*, 133 F.3d 225 (3d Cir.), *cert. denied*, 525 U.S. 817 (1998).

For most of the same reasons that I dismissed Read's fraud claims, *supra*—particularly, Read's failure to establish that Profeta made a false or

incorrect statement—the negligent misrepresentation claims will be dismissed as well. *See* section III.D, *supra*. Profeta's statements amounted to little more than requests for more information, a hope that the magazine would launch, and a conditional commitment to fund the magazine.

Read also suggests that the source of duty here was a joint venture. For the reasons expressed for rejection of Read's breach of fiduciary duty claim, that claim is similarly rejected here. *See* section III.C, *supra*.

Accordingly, summary judgment is granted as to Read's negligent misrepresentation claims.

### F. Theft of Intellectual Property

Read's claim of "theft of intellectual property" (Count 1) alleges that he shared his ideas for *The Downtowner* with the defendants, who misappropriated the ideas and used them to create *Radius*. (AC ¶¶55-60).

Defendants move for summary judgment on this claim on the basis that the concept behind *The Downtowner* was not novel; that Read failed to keep the idea confidential; and that Profeta neither "adopted" nor "made use of" Read's proposed business model. (DSJBr at 9-12).

There is no claim that Read possessed intellectual property in the sense of, say, a copyright or trademark. As the parties recognize, Read is alleging misappropriation of a mere idea. (DSJBr at 9; PBr at 1). "An idea, as distinguished from the copyrighted contents of a book or a patented device or process, is accorded no protection in the law unless it is acquired and used in such circumstances that the law will imply a contractual or fiduciary relationship between the parties." *Flemming*, 107 N.J. Super. at 315 (citing *J. Irizarry y Puente v. President & Fellows of Harv. Coll.*, 248 F.2d 799 (1st Cir. 1957), *cert. den.*, 356 U.S. 947 (1958)). "Where a person communicates a novel idea to another with the intention that the latter may use the idea and compensate him for such use, the other party is liable for such use and must pay compensation if he actually appropriates the idea and employs it in connection with his own activities." *Id.* at 317 (citation omitted).

To state a claim for misappropriation of an idea, a plaintiff must show that "(1) the idea was novel; (2) it was made in confidence[;] and (3) it was adopted and made use of" by the defendant. *Id.*; *see Johnson v. Benjamin Moore & Co.*, 347 N.J. Super. 71, 84 (2002); *see also Duffy v. Charles Schwab & Co., Inc.*, 123 F. Supp. 2d 802, 807-08 (D.N.J. 2000).

Although novelty does not have a clear definition under New Jersey law, *Baer*, 392 F.3d at 627, courts have set forth some guiding principles. For example, an idea is not novel if "it was merely 'a different application of a long-established principle []' or if 'a competitive product similar to [the plaintiff's] was [already] on the market.'" *Duffy*, 123 F. Supp. 2d at 809 (citation omitted). "[I]nnovation, originality, or invention" are hallmarks of novelty. *Id.*

An idea that is an "adaptation of an existing idea or [that] embodies elements long in use" may nevertheless be novel if "the adaptation or combination would lead to a significantly new and useful result." *Id.* at 810. Still, "[a]n idea lacks novelty if it is merely a clever or useful adaptation of existing knowledge, or it is no more than a variation on a basic theme." *Vent v. Mars Snackfood US, LLC*, 611 F. Supp. 2d 333, 338 (S.D.N.Y. 2009) (applying New Jersey law) (citation omitted).

The court in *Duffy* noted that the following factors are relevant to the novelty inquiry:

> (1) the idea's specificity or generality (is it a generic concept or one of specific application?), (2) the idea's commonality (how many people know of this idea?), (3) the idea's originality (how different is this idea from generally known ideas?), (4) the idea's commercial viability (how widespread is the idea's use in the industry?), (5) the idea's obviousness (was the idea an obvious adaptation or application of an idea already in the domain of public knowledge?), and (6) the idea's secrecy (did an otherwise novel idea lose its novelty status because of inadequate steps taken to maintain the idea's secrecy?).

*Duffy*, 123 F. Supp. 2d at 810.

"Denying recovery for the use of ideas that are not novel properly confines protection to those ideas that are truly valuable to society." *Blackmon*

47

*v. Iverson*, 324 F. Supp. 2d 602, 607 (E.D. Pa. 2003). "An idea is novel and merits protection when it is truly innovative, inventive, and new." *Id.*

Novelty is an issue of law for the court, "although some of the factors relevant to a determination of novelty may be factual." *Duffy*, 123 F. Supp. 2d at 809; *accord Baer*, 392 F.3d at 628 ("We believe that the district court [in *Duffy*] was correct in its conclusion as to how the New Jersey Supreme Court would decide this issue.").

In addition to novelty, a plaintiff must show that he or she shared the idea in a climate of confidence. An idea "is accorded no protection in the law unless it is acquired and used in such circumstances that the law will imply a contractual or fiduciary relationship between the parties." *Flemming*, 107 N.J. Super. at 315. In the "absence of such, the parties are merely competitors." *Anderson v. Century Prods. Co.*, 943 F. Supp. 137, 151 (D.N.H. 1996)

Here, Read has not shown the requisite contractual or fiduciary relationship between the parties. *See* sections III.A (breach of contract) and III.C (breach of fiduciary duty), *supra*. He also has failed to establish that his idea was novel or was kept confidential. This claim, then, fails for multiple reasons.

Read stresses that he disclosed his ideas only to potential investors, not to everyone, and that he marked the Executive Summary to Profeta as "confidential."[28] I do not agree that an idea disseminated to potential investors is confidential so long as it was not generally published. *See Keane v. Fox TV Stations, Inc.*, 297 F. Supp. 2d 921, 940 (S.D. Tex. 2004) ("By gratuitously sending a packet of information to a company, hoping that the company might contribute financially to Keane's desire to turn an idea into a production of some kind, Keane extinguished any property right to a trade secret that he might have had. Keane had no ability to create a confidential relationship

---

[28]     Read asserts that his "materials" were marked "confidential." (PBr at 1). There is no citation to the record for this assertion. Based on the Court's review of the record, the only document marked confidential was Read's Executive Summary.

between him and the production companies to whom he allegedly sent his idea simply by declaring that it was self-evident that he was hoping to be paid for its use."), *aff'd*, 129 Fed. App'x 874 (5th Cir. Mar. 17, 2005), *cert. denied*, 546 U.S. 938 (2005). It is true that one document, the Executive Summary, was marked "confidential." The Executive Summary, however, was sent on September 26, 2012, after Read had already had extensive discussions with Profeta about the magazine, and after Read had floated his idea to potential backers without confidentiality restrictions. Indeed, Read acknowledged that for some eighteen months he pitched the magazine to "anyone in Newark who would listen" (DSUMF ¶46(c), PRS ¶46(c)), and that he disclosed his research regarding his platform to everyone "who asked." (DSMF ¶34; PRS ¶34).

Read's claim also fails on the novelty element. Read essentially argues that the novelty of his idea "lies in the fact that no other Newark publication like it existed." (PBr at 6). First, this contention is exaggerated. *Newark Bound*, a Newark-centric magazine, was released while the parties were discussing *The Downtowner*. (DSUMF ¶15; PRS ¶15; Read Dep. II at 274:11-14). Second, and more generally, a magazine focusing on a particular city is not a "novel" idea. While the idea to create a Newark-specific magazine might be considered a "specific" application, there can be no doubt that the concept is generic and commonplace. Read acknowledges that many municipalities, including nearby ones like Hoboken and Jersey City, have city-centric magazines. (DE 71-19). In developing *The Downtowner*, Read researched other city-specific magazines, including ones for Clifton, Asbury Park, Charlotte, Cleveland, and New Orleans. (DE 71-8, 71-20, 71-32, 71-13). In other words, Read's concept was simply to adapt an idea already in the public domain and try it in a particular location, Newark. *See Bertani Promotional Displays v. Midwest Display, Inc.*, 2007 N.J. Super. Unpub. LEXIS 1647, at *14 (App. Div. Mar. 8, 2007) (affirming summary judgment because plaintiff's idea, drive-through Christmas light show in a specific location, was not novel and existed in other towns).

Summary judgment will be granted in favor of defendants on Read's misappropriation claim (Count 1).[29]

## G. Conversion

Read's conversion claim alleges that Profeta "falsely represented" that Read would be compensated "for his ideas and work," and that defendants "took and developed the Plaintiff's idea without compensation." (AC ¶¶103-105). Profeta responds that Read's "idea," or intangible property, is not entitled to legal protection. (DSJBr at 18-19).

"In New Jersey, conversion is defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Capital Health Sys. v. Veznedaroglu*, 2017 U.S. Dist. LEXIS 28390, at *32-33 (D.N.J. Feb. 27, 2017) (quoting *Ricketti v. Barry*, 2015 WL 1013547, at *8 (D.N.J. Mar. 9, 2015)); *see Chi. Title Ins. Co. v. Ellis*, 409 N.J. Super. 444, 456 (App. Div. 2009); *Scholes Elec. & Communs. v. Fraser*, 2006 U.S. Dist. LEXIS 39287, at *11 (D.N.J. June 14, 2006). Common law conversion consists of the following elements: "(1) the existence of property, (2) the right to immediate possession thereof belonging to [the] plaintiff, and (3) the wrongful interference with that right by [the] defendant." *Capital Health Sys.*, 2017 U.S. Dist. LEXIS 28390, at *33.

However, "a mere abstract idea, incapable of material embodiment, cannot be the subject of a claim for conversion." *Flemming,* 107 N.J. Super. at 316; *see also Premio Foods, Inc. v. Purdue Farms, Inc.*, 2012 U.S. Dist. LEXIS 107421, at *18 (D.N.J. July 30, 2012) (dismissing conversion claim that alleged that defendants "misappropriated [plaintiff's] intangible trade secrets and applied them to [defendant's] business operation . . . because [plaintiff did] not allege that Defendants are in possession of any of [plaintiff's] tangible property."). "Absent a specific holding from the New Jersey Supreme Court

---

[29]    I do not address Profeta's arguments regarding whether he "adopted" or "made use of" Read's ideas.

regarding the conversion of intangible property, this District has consistently interpreted New Jersey law to limit conversion to tangible property." *Capital Health Sys.*, 2017 U.S. Dist. LEXIS 28390, at *33 (citing *Ricketti*, 2015 WL 1013547, at *8 (compiling numerous cases from District of New Jersey finding that intangible property cannot be the subject of conversion)).[30]

Read's conversion claim fails because he does not allege that Profeta possesses any of his tangible property.[31] Indeed, as noted above, Read does not even claim that he owns the rights to his idea. Without such a possessory or ownership interest, Read has no conversion claim.

Accordingly, Profeta's motion for summary judgment on Count 6 of the complaint alleging conversion is granted.

### H. Interference with Prospective Economic Advantage

Read's claim for interference with a prospective economic advantage (Count 3) alleges that defendants "intentionally and maliciously sought to prevent the Plaintiff from marketing his ideas and services to other entities or pursuing other business." (AC ¶¶85). This count also alleges that defendants "falsely represented to the Plaintiff renumeration for his efforts should he entrust his ideas and provide his services to them and to include them in the magazine." (AC ¶87).

Defendants argue that the record is devoid of any evidence that the defendants prevented Read from marketing his ideas to others, or that defendants promised Read remuneration. (DSJBr at 21). Defendants further

---

[30]    The one exception to this rule, as cited by Profeta, appears to be money, to the extent that "a plaintiff can allege that the defendant converted specific segregated or identifiable funds." *Scholes Elec. & Communs*, 2006 U.S. Dist. LEXIS 39287, at *15. There is no such claim here.

[31]    Instead of addressing the merits of the conversion claim, Read complains about "discovery abuses" that occurred during his deposition. (PBr at 12). Read principally argues that he was "forced" to admit to certain facts in response to defense counsel's questions. *Id.* However, a review of Read's deposition reveals that (1) Read was non-responsive to many of defense counsel's questions; and (2) Read did not object during the deposition. Read's belated certification attesting to alleged discovery abuses, submitted in the hope of defeating defendants' motion for summary judgment, is insufficient to create an issue of fact on his conversion claim.

argue that Read has failed to define a prospective advantage with which Profeta interfered. (DSJRBr at 11). Read responds that he "worked exclusively on the Magazine for and at the Defendant's behest for a significant period of time in which the Defendant was acutely aware that the Plaintiff was without resources and was not pursuing independent leads." (PBr at 16).

"An action for tortious interference with a prospective business relation protects the right 'to pursue one's business, calling or occupation free from undue influence or molestation." *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 750 (1989). "What is actionable is '[t]he luring away, by devious, improper and unrighteous means, of the customer of another." *Id.* (citation omitted).

To establish a claim for tortious interference, a plaintiff must establish (1) that it had an existing contract or reasonable expectation of economic benefit or advantage; (2) that the defendant knew of the contract or expectancy; (3) that the defendant wrongfully interfered with that contract or expectancy; (4) that it is reasonably probable that the loss of the contract or prospective economic gain was a result of the interference; and (5) that damages resulted from the interference." *Florian Greenhouse, Inc v. Cardinal IG Corp.*, 11 F. Supp. 2d 521, 525 (D.N.J. 1998); *Palm Bay Imports v. Miron*, 2001 U.S. Dist. Lexis 25119 (D.N.J. 2001), *aff'd*, 55 Fed. App'x 52 (3d Cir. 2002).

With respect to the first element, the plaintiff must show that it had a "protectable right." *Printing Mart–Morristown*, 116 N.J. at 751. Such a right need not necessarily arise from an existing contract, but "there must be allegations of fact giving rise to some 'reasonable expectation of economic advantage'" or demonstrating that "plaintiff was in 'pursuit' of business." *Id.*; *see also Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 412 (3d Cir. 2016) (affirming grant of summary judgment in favor of defendant on tortious interference claim where plaintiff failed to point to "one specific example where it has credible evidence that [defendant's] allegedly tortious conduct harmed its business.").

Moreover, "New Jersey law requires that a plaintiff alleging tortious interference with existing or prospective advantage present proof that *but for* the acts of the defendant, the plaintiff 'would have received the anticipated economic benefits.'" *Lightning Lube, Inc.*, 4 F.3d at 1168; *see Santana Prods. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 140 (3d Cir. 2005) (affirming grant of summary judgment in favor of defendant on tortious interference claim where plaintiff had identified "one prospective contract," but failed to show that it was "reasonably probable" that plaintiff would have been winning bidder on government contract).

Read's argument on this count misses the mark. That Read did not pursue independent leads does not imply that the defendants wrongfully interfered with his ability to do so. Read has not made a threshold showing of a single lost opportunity or prospective opportunity. Moreover, he has not shown that the defendants interfered with, or were the but-for cause, his loss of any opportunity.

Accordingly, summary judgment will be granted on Count 3 of the complaint.

### I. Unjust Enrichment & Quantum Meruit

Read's claims of unjust enrichment and quantum meruit assert that Read provided ideas and services to Profeta, and that defendants benefited from and used Read's ideas and services without providing deserved compensation. (AC ¶¶127-135). Defendants move for summary judgment on these claims on the basis that Read testified that he had "no expectation" of receiving a "particular dollar amount" from defendants. (DSJBr at 22). Defendants also argue that Read has failed to present evidence to establish the reasonable value of his services. (DSJBr at 22-23).

"Quantum meruit is a form of quasi-contract, . . . which means 'as much as he deserves.'" *Kopin v. Orange Prods., Inc.*, 297 N.J. Super. 353, 367 (App. Div.) (citation omitted), *certif. denied*, 149 N.J. 409 (1997). "[C]ourts have allowed quasi-contractual recovery for services rendered when a party confers a

benefit with a reasonable expectation of payment." *Weichert Co. Realtors*, 128 N.J. at 437. Quantum meruit "rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.'" *Id.* (quoting *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 108 (App. Div. 1966)).

Recovery is permitted "when one party has conferred a benefit on another, and the circumstances are such that to deny recovery would be unjust." *Id.* (real estate agent who was the "procuring cause" of a sale was entitled to the reasonable value of his services under quantum meruit theory). For a quantum meruit claim, "[i]t is well settled that where one performs services for another at his request, but without any agreement or understanding as to wages or remuneration, the law implies a promise on the part of the party requesting the services to pay a just and reasonable compensation." *Kopin*, 297 N.J. Super. at 367 (citation omitted).

"To recover under a theory of quantum meruit, a plaintiff must establish: '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they were rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Starkey v. Estate of Nicolaysen*, 172 N.J. 60, 68 (2002) (quoting *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir. 1994) (internal quotations and citations omitted)); *see Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 519 (D.N.J. 2009), *aff'd*, 374 Fed. App'x 341 (3d Cir. 2010).

Unjust enrichment is an equitable cause of action that imposes liability when a "defendant received a benefit" and defendant's "retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994). To state a claim for unjust enrichment, a plaintiff must show that "(1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." *Arlandson v. Hartz Mt. Corp.*, 792 F. Supp. 2d 691, 711 (D.N.J. 2011) (internal quotation and citation omitted).

While "damages need not be proved with precision where that is impractical," New Jersey "law abhors damages based on mere speculation." *Mosley v. Femina Fashions, Inc.*, 356 N.J. Super. 118, 129 (App. Div. 2002) (internal quotations omitted); *see also Rowland v. Hudson Cnty.*, 7 N.J. 63, 74 (1951) (excluding as speculative evidence of estimated costs as a measure of quantum meruit recovery for architectural work that was never completed).

A plaintiff must provide competent evidence "to enable a jury intelligently and fairly to place a reasonable value upon the services claimed to have been rendered." *Perlberg v. Geminder*, 20 N.J. Super. 191, 198 (App. Div. 1952); *see Weichert Co. Realtors*, 128 N.J. at 437 (recovery under quantum meruit theory is generally limited to market value of services or costs); *see also Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 131 (3d Cir. 1999) (recognizing that "plaintiff bears the burden of producing sufficient evidence of what constitutes a reasonable market rate for the essential character and complexity of the . . . services rendered in order to make out a prima facie case. . . . [D]efendant may contest that prima facie case only with appropriate record evidence.").

The evidence in the record concerning the value of Read's "services," the costs incurred by Read, or of any benefit that was conferred by Read to Profeta is deficient. Read did not keep track of the hours that he claims to have expended and did not submit expenses to Profeta. (Read Dep. I at 52:6-8; Read Dep. II at 208:16-209:19; DSUMF ¶45; PRS ¶45). It is not clear if Read kept track of any of his expenses at all.

In prior sections, I have already discussed the lack of any promise or reasonable expectation that Read, an entrepreneur seeking an investor, would be paid for his efforts. Most of the two year period for which Read seeks compensation was spent in soliciting investors other than Profeta. I add that the conferral of a benefit, or Profeta's "enrichment," is dubious. Asked to identify such a benefit, Read suggested that he had gratified Profeta's "ego." *Radius,* as noted, lost money.

Nor is the value of such services established with any certainty. Read testified that his investment of time and expenses is "subjective" and is "open to anyone's interpretation." (DSUMF ¶48; PRS ¶48). Read's answers to interrogatories state that he "invested literally hundreds of hours to the project over two years, which he [estimates] to be worth approximately $200,000." (DE 71-5, at 7). It is unclear how Read came up with this figure. (*See id.*; PSMF ¶66). It appears to be entirely speculative. And unlike the majority of cases that have sustained such a cause of action at the summary judgment stage, Read has not proffered expert testimony.

Accordingly, defendant's motion for summary judgment on these claims of unjust enrichment and quantum meruit is also granted.[32]

### IV.  Read's Motion for Summary Judgment

The counterclaim's remaining causes of action against Read are tortious interference with prospective economic advantage (second count); defamation and slander (third count); tortious interference with contractual relations (fourth count); false light (fifth count); and trade libel (sixth count). (DE 41). Read's motion for summary judgment is granted as to all.

### A. Read's Motion to Strike Profeta's Declaration

Before addressing the merits of Read's motion for summary judgment, I consider Read's motion to strike Profeta's declaration. That declaration, for the first time in this litigation, presents evidence that was requested by Read but not provided by Profeta during discovery. Read also argues that the declaration contains inadmissible hearsay and fails to set forth the affiant's personal knowledge of the facts alleged. In particular, Read seeks to strike the following paragraphs from Profeta's declaration: 5, 6, 7, 8, 9, and 12. (PSJRBr at 5).

On a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Federal Rule of Civil

---

[32]    Because Read has failed to set forth any viable cause of action at this stage, Count 14, requesting injunctive relief, is also dismissed.

Procedure 56(c)(4) sets out three elements that a declaration in support of a summary judgment motion must meet. It "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(C)(4).

Second, the Local Civil Rules require that affidavits be factual and rest on personal knowledge:

> Affidavits, declarations, certifications and other documents of the type reference in 28 U.S.C. § 1746 shall be restricted to statements of fact within the personal knowledge of the signatory. Argument of the facts and the law shall not be contained in such documents. Legal arguments and summations in such documents will be disregarded by the Court and may subject the signatory to appropriate censure sanctions or both.

L. Civ. R. 7.2(a). "Any certification, or portion of a certification, that violates this rule must be disregarded by the court." *Pasqua v. Cnty. of Hunterdon*, 2016 U.S. Dist. LEXIS 106143, at *23 (D.N.J. Aug. 11, 2016) (citing *Fowler v. Borough of Westville*, 97 F. Supp. 2d 602, 607 (D.N.J. 2000) (holding that courts may disregard statements in affidavit which are not based on personal knowledge)); *see also Dreyer v. Altchem Envtl. Servs., Inc.*, 2007 WL 7186177, at *3 (D.N.J. Sept. 25, 2007) ("Courts will not consider affidavits that are not founded on personal knowledge." (citation omitted)).

Personal knowledge for purposes of Federal Rule of Evidence 602 "may consist of what the witness thinks he knows from personal perception," and requires that the witness "who testifies to a fact . . . actually observed the fact." *See Schatz-Bernstein v. Keystone Food Prods.*, 2009 U.S. Dist. LEXIS 34700, at *6 (D.N.J. Apr. 17, 2009) (disregarding portion of certification that "does not attest to the fact the affiant has personal knowledge.").

On summary judgment, courts may consider hearsay as follows:

> The rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial. In ruling on a motion for summary judgment, the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of

material fact at trial. The proponent need only 'explain the admissible form that is anticipated.'" Thus, in ruling on Defendants' motion for summary judgment, the district court should have limited its inquiry to determining if the out-of-court statements Plaintiffs were relying on were admissible at trial.

*Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238-39 (3d Cir. 2016) (internal citations omitted) (holding that out-of-court statements that plaintiffs relied on were admissible at trial when "[p]laintiffs identified the out-of-court declarants . . . and noted their availability to testify"); *see also* Fed. R. Civ. P. 56 (advisory committee notes to 2010 edition) ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.").

Thus, if the party submitting hearsay adequately explains the admissible form in which such evidence will be offered at trial, the court will consider it on summary judgment. *See Frilando v. Bordentown Driver Training Sch., LLC*, 2017 WL 3191512, at *15 n.19 (D.N.J. 2017) ("Frilando argues Diab's testimony concerning what the authorities told him is inadmissible hearsay. Bordentown says it is not hearsay because it is not being offered to prove the truth of the statement. The rule in this circuit is [contained in *Fraternal Order, supra*]. I accept Bordentown's explanation and therefore consider Diab's testimony on this motion." (internal citations omitted)); *see also Watkins v. Wells Fargo Bank, N.A.*, 2017 WL 2399086, at *4 n.3 (D.N.J. June 2, 2017) ("Plaintiff argues that Wells Fargo's records cannot be considered by this Court on summary judgment on the grounds of hearsay. Plaintiff is incorrect . . . Here, Defendant has proffered that these documents are capable of being admissible at trial as business records under Federal Rule of Evidence 803(6)." (internal citations omitted)).

"As a general proposition, 'conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.'" *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012) (quoting *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009)). On the other hand, "a single, non-conclusory, affidavit or witness's testimony, when

based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment or judgment as a matter of law." *Cappuccio v. Prime Capital Funding LLC*, 649 F.3d 180, 189 (3d Cir. 2011) (citation omitted). "Put differently, a self-serving affidavit may defeat summary judgment in the absence of other evidence rendering it incredible." *Marrin v. Capital Health Sys.*, 2017 WL 2369910, at *17 (D.N.J. May 31, 2017) (quotation and citation omitted).

The challenged paragraph of Profeta's declaration most clearly permissible under these standards is paragraph 12:

> 12. The author of the Newark Star Ledger article told me that it was "planted" by Read, and that Read, a former employee of the Newark Star Ledger, essentially wrote the article, which was then published under the author's byline.

(Profeta Decl. ¶12). During his deposition, Profeta testified as to his conversation with Zambito, under whose byline the article appeared. Paragraph 12 of the declaration carries the clear implication (confirmed by the defendant's brief (DSBr 12)) that Zambito is the witness who could be called to testify to these facts. This paragraph thus meets the personal knowledge and competency requirements, and there is no unfair surprise. Accordingly, Read's motion to strike paragraph 12 is denied.

Regarding the remaining paragraphs (¶¶5, 6, 7, 8 and 9), defendants principally confine themselves to addressing Read's hearsay objections. As to personal knowledge, they unhelpfully proffer the following: "As is evident from the fact of the Profeta Decl. that Profeta had personal knowledge of the factual statements contained in his declaration." (DSBr at 12).

First, defendants argue that paragraphs 5, 6, and 7 of the certification are admissible under the party-opponent hearsay exception. *See* Fed. R. Evid. 801(d)(2). Those paragraphs provide, in full:

> 5. Read was incensed by the launch of *Radius* and commenced a campaign of callousness directed at me and *Radius*, designed to defame and destroy my magazine.

6. Thus, Read began to communicate falsely to third-parties that I had "stolen" his business plan and magazine concept in an effort to forestall *Radius'* success and decimate its ability to turn a profit.

7. Towards this end, Read communicated falsely to *Radius'* funding and advertising sources, including many of *Radius'* "Founders", that *Radius* was based upon Read's "stolen" magazine concept. As a result, *Radius'* ability to raise funds for its continued operations was inhibited.

(Profeta Decl. ¶¶5-7). Of course, Read's own statements are admissible against him as non-hearsay, *see* Fed. R. Evid. 801(d)(2), *provided* there is some foundation to suggest that he made them. Profeta's declaration offers none.

The basis of Profeta's knowledge as to these facts is unstated. Nor do these assertions offer the Court a basis to infer that he is speaking from personal knowledge. Profeta does not attest that Read made these "defamatory" statements in his presence; rather, the implication is that Read made them to "third-parties" or Founders. Those unidentified third parties are not parties-opponent, and they are not offered up as witnesses.[33]

Moreover, Profeta cannot competently attest to Read's state of mind (that Read was "incensed" and that the purpose of Read's communications was "to forestall Radius's success"). Accordingly, the Court will grant Read's motion to strike paragraph 5, 6, and 7.

Next, defendants argue that paragraphs 8 and 9 are admissible under the state-of-mind exception to the hearsay bar. (DSBr at 8; *see* Fed. R. Evid. 803(3)). Defendants assert that the factual assertions in these paragraphs are submitted as evidence of motive. Those paragraphs provide as follows:

8. Indeed, I heard from the marketing people with several of *Radius'* advertisers that the executives in the companies were extremely disappointed with me for "stealing" Read's idea and they

---

[33]     Paragraph 5 need not be credited insofar as it alleges the legal conclusion that Read "defamed" Profeta. *See Lucas v. Romito*, 2017 U.S. Dist. LEXIS 151195, at *18-19 (D.N.J. Sep. 18, 2017) (disregarding plaintiff's affidavit and granting summary judgment where plaintiff's "statement that Defendant's agent promised that she 'would now be allowed to stack [Plaintiffs'] UM/UIM insurance coverage for up to three vehicles' contains a legal conclusion, as 'stackable' is a legal conclusion.").

were not sure that they wanted to continue supporting my
operation.

> 9. As a result of Read's false statements, the following companies
> discontinued purchasing advertising from *Radius*: Commercial
> Mortgage, Cook Maran, Dr. Boiardo/CarePoint, ECC, Flemington
> Car & Truck Country, Genova Burns Giatomasi & Webster,
> Hollister Construction, Hehl & Hehl, J.P. Morgan, Korman,
> McElroy Deutch Mulvaney & Carpenter, MCJ Amelier - My
> Brother's Keeper, PUIF, St. Michael's Hospital, United Energy
> Consultants, Van Cleef, and Verizon. Prior to Read's statements,
> each of these advertisers had been purchasing advertising of
> $4,000 per quarter.

(Profeta Decl. ¶¶8-9). Same problem. The statements, *if* made, might be
admissible over a hearsay objection. But Profeta's saying, after the close of fact
discovery, that he "heard" these statements had been made does not provide
the necessary foundation.

Here, defendants principally rely on *Callahan v. A.E.V., Inc.*, 182 F.3d
237, 252-53 (3d Cir. 1999), wherein the Third Circuit partially reversed a grant
of summary judgment in favor of defendants because the district court
mistakenly excluded evidence as hearsay. In that antitrust case, the plaintiffs,
who ran "mom-and-pop" beer stores, sued a supermarket-style beer distributor
which had allegedly pressured a major wholesaler to obtain exclusive
discounts. *Id.* at 240.[34]

The district court excluded the plaintiffs' deposition testimony that their
customers had reported switching to the defendants because the defendants
offered lower prices. *Id.* at 250. As a result of that evidentiary ruling, the
district court concluded that the plaintiffs could not prove damages associated
with the illegal conduct. *Id.*

In reversing this aspect of the district court's decision, the Third Circuit
held that these customers' hearsay statements were admissible under Federal

---

[34]     The Third Circuit noted that its analysis of the issues presented in *Callahan*
was limited to damages. Liability was not raised in the appeal. 182 F.3d at 241
("Strangely, antitrust *liability* issues are not presented in this appeal.").

Rules of Evidence 803(3) to show the customers' motive, *i.e.*, why the customers had taken their business elsewhere. *Id.* at 251-52. The statements could not be used, however, to establish actual loss. *Id. Id.* at 252 (quotation and internal punctuation omitted); *see also Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1274 (3d Cir. 1995) (holding that customers' statements to plaintiff's employees that customers ceased business with plaintiff was not admissible to prove amount of business lost to competitor).

*Callahan,* a single-level hearsay case, does not solve the double-hearsay problem of paragraph 8. Profeta is reporting what the "marketing people" said to him about what the "executives" said to them. While the executives' statements may be admissible to show motive under Rule 803(3), they did not make those statements to the affiant, Profeta, but to an intermediary. Paragraph 8 is entirely stricken.

The portion of paragraph 9 which claims that Profeta lost business "as a result of Read's false statements" is also stricken. While this statement might be relevant to the motivations of Profeta's customers, the only basis for it is the two-level hearsay identified in paragraph 8.

The remainder of paragraph 9 provides a list of businesses that ceased doing business with Profeta. That list is presumably based on his personal knowledge, and I would not strike it for lack of a foundation. He draws no factual link between the lost advertisers and any defamation, but it is possible he could do so through other evidence.

But set that all aside. I nevertheless find that there is justice in Read's claim that he has been sandbagged by this declaration, submitted after the close of fact discovery. Profeta tries to shift the blame to Read: "Plaintiff did not ask me any questions during my deposition about the third-parties, including potential funding sources and advertising, to whom Read had communicated his defamatory and libelous statements." (Profeta Decl. ¶13). That assertion is contradicted by the record and inconsistent with this Court's discovery rules. Rule 26(a) requires a party, without awaiting a discovery request, to disclose

the identity and contact information of individuals likely to have discoverable information that the disclosing party may use to support its case. Fed. R. Civ. P. 26(a)(1)(A)(i). Rule 26(e) imposes a continuing obligation on a party to supplement its Rule 26(a) disclosures as well as its discovery responses "in a timely manner" if it learns additional or corrective information through the discovery process. Fed. R. Civ. P. 26(e)(1). The nature of this counterclaim is that Read's alleged defamation caused advertisers to cease doing business with *Radius;* it strains credulity that Profeta is now surprised by the obligation to support his claims of lost advertising revenue.

The consequence of failing to provide facts and documents in discovery, when required in pretrial disclosures or requested during discovery, is that such evidence cannot be used in opposition to summary judgment. Rule 37(c)(1) makes this obligation clear and provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a motion, . . . unless the failure was substantially justified or harmless."

"The exclusion of such evidence is meant to be 'self-executing' according to the Advisory Committee Note accompanying enactment of the current version of Rule 37(c) in 1993." *Carmichael v. Thomson*, 2018 U.S. Dist. LEXIS 166260, at *10 (D.N.J. Sep. 27, 2018). According to the Advisory Committee, "[t]his automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at a trial, at a hearing or on a motion, such as one under Rule 56." *Id.*

Profeta had the burden to show that the failure to disclose this information previously was "substantially justified or harmless." I cannot conclude that it was; quite the contrary:

Read's initial written discovery requests to Profeta expressly asked Profeta to "set forth in detail" the "factual allegations, including the amount(s) and type(s) of damages" in support of his counterclaim against Read. (DE 65-10, Interrogatory ¶18). In Profeta's November 15, 2017 certified responses, he incorporated the general allegations of his counterclaim, and provided no

further detail. (*Id.*). In terms of damages, Profeta responded that he "sustained special damages," a legal conclusion, and "incurred legal fees," without further elaboration. (*Id.* at ¶18; PSUMF ¶33).

In response, plaintiff's counsel sent a deficiency letter, requesting more information regarding Interrogatory No. 18. (DE 65-11). Instead of providing more information, defense counsel responded with a second brush-off: the "amount of special damages if awarded are within the discretion of the court and jury to be determined by them." (DE 65-11; PSUMF ¶35). Well, obviously—but the Interrogatory was legitimately requesting the evidentiary basis for any such damages.

Plaintiff's counsel sent a second deficiency letter. (DE 65-12; DE 74-2, ¶6; DE 74-5). This letter noted the deficient response to Interrogatory No. 18, stating that Profeta failed to provide "any" factual bases for the counterclaims as well as a calculation of damages. (DE 74-5, at 3). Read requested confirmation that Profeta did not have any "actual" damages. (DE 74-5, at 3). Thereafter, Profeta "supplemented" his discovery responses with the *Star-Ledger* article and claimed that this article was "an item of special damages" that "damaged Mr. Profeta's reputation in the community." (DE 74-6). He provided nothing further.

Profeta's initial Rule 26 disclosures identified himself, Read, Coleman, and Kohn as potential witnesses. (PSJRBr at 6-7). During his deposition, Profeta testified that the following individuals had knowledge of his counterclaims: Steven Coleman, Phil Read and his son; Bob Bogert; and Zambito. (Profeta Dep. at 10:23-11:25). These were the only individuals that Profeta could "recollect" at the time of his deposition. (Profeta Dep. at 11:25).[35]

---

[35] "A district court may find a declaration to be a sham when it contains facts that the affiant previously testified he could not remember." *Crawford v. George & Lynch, Inc.*, 19 F. Supp. 3d 546, 557 (D. Del. 2013).

The purpose of the "sham affidavit doctrine" is to prevent a party from defeating summary judgment "by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 251 (3d Cir. 2007) (citing *Baer*, 392 F.3d at 624). A

It is clear to this Court that Profeta failed to respond to legitimate discovery demands and twice failed to remedy deficiencies when they were pointed out to him. Profeta has not presented a credible justification for the belated disclosures in his declaration.

I also cannot conclude that the disclosure is harmless. The disclosure, after the close of discovery and at the summary judgment stage, has deprived Read the opportunity to conduct any discovery into these alleged damages. Fact discovery was closed on July 31, 2018, inhibiting Read's ability to cure the clear prejudice.

Accordingly, the Court will strike and disregard paragraphs 5, 6, 7, 8, 9, and 12 of Profeta's declaration. I find that striking this portion of the Profeta's declaration is a sufficient sanction; I decline to exercise my discretion to also impose monetary sanctions. *See DiGregorio v. First Rediscount Corp.*, 506 F.2d 781, 788 (3d Cir. 1974); *see also Halsey v. Pfeiffer*, 2010 WL 3735702, *1 (D.N.J. Sept. 17, 2010).[36]

_____

certification is a "sham" if it contradicts the affiant's prior testimony and there is no valid explanation for the inconsistency. *Baer*, 392 F.3d at 624.

However, "[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit." *Baer*, 392 F.3d at 625. "Such corroborating evidence may establish that the affiant was 'understandably' mistaken, confused, or not in possession of all the facts during the previous deposition." *Jiminez*, 503 F.3d at 254. In the event that the swearing party fails to explain the contradiction or offers a "weak explanation for his sudden ability to remember important facts," a district court may "disregard the subsequent affidavit and the alleged factual issue in dispute as a 'sham,' therefore not creating an impediment to a grant of summary judgment based on the deposition." *Crawford*, 19 F. Supp. 3d at 557 (citing *Yeager*, 693 F.3d at 1081); *Jiminez*, 503 F.3d at 254.

Here, Profeta has offered no explanation for his sudden ability to recall critical facts. Paragraph 9 may also properly be disregarded under the sham affidavit doctrine.

[36] I make one other point. Profeta has essentially placed the general allegations of his counterclaim into an affidavit. As noted above, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.'" *Gonzalez*, 678 F.3d at 263; *see Lujan,* 497 U.S. at 888 (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also* Section I., A., 2, n.11, *supra* (explaining requirement of competent evidence on summary

## B. Defamation, Slander, False Light, and Trade Libel

The only competent evidence before the Court regarding a false or defamatory statement is the *Star-Ledger* article that essentially reported the allegations of the complaint as such. Profeta added in his deposition that his business colleagues mentioned the article to him. (These, unlike the statements discussed above, were at least made directly to Profeta and, although vague, may be relevant to show that the article was read by the relevant audience.)

A claim for defamation has three elements: "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." *Leang v. Jersey City Bd. of Educ.,* 198 N.J. 557, 585 (2009); *see G.D. v. Kenny,* 205 N.J. 275, 293 (2011). A defamatory statement may consist of libel (i.e., a written defamatory statement) or slander (i.e., an oral defamatory statement). *W.J.A. v. D.A.,* 210 N.J. 229, 238 (2012).

A defamatory statement is "'false and injurious to the reputation of another or exposes another person to hatred, contempt or ridicule or subjects another person to a loss of the good will and confidence in which he or she is held by others.'" *Soobzokov v. Lichtblau,* 664 F. App'x 163, 166 (3d Cir. 2016) (quoting *Romaine v. Kallinger,* 109 N.J. 282, 537 A.2d 284, 287 (1988)). "A defamatory statement, generally, is one that. . . deter[s] others from wanting to associate or deal with [the subject of the statement]." *Kenny,* 205 N.J. at 293 (internal citations and quotations omitted).

To determine if a statement has a defamatory meaning, "a court must consider three factors: (1) the content, (2) the verifiability, and (3) the context of the challenged statement." *Leang,* 198 N.J. at 585. A "statement's content must be judged not by its literal meaning but by its objective meaning to a reasonable person of ordinary intelligence." *McLaughlin v. Rosanio, Bailets &*

---

judgment motion). Given the conclusory nature of the affidavit, it is doubtful that even if I accepted these assertions, they would be sufficient to defeat summary judgment.

*Talamo*, 331 N.J. Super. 303, 312 (App. Div. 2000). Regarding context, "a statement's meaning can be affected by its context." *Id.* (citation omitted).

Finally, "only verifiable statements can be defamatory." *Id.* Thus, "recovery is limited to defamatory false averments of fact and the truth of the statement is a complete defense to a defamation action." *Id.* Truth may be asserted as a defense even when the allegedly defamatory statement "is not perfectly accurate." *Leang,* 198 N.J. at 585. The law of defamation "overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 516 (1991) ("Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." (quotations and citation omitted)); *Salzano v. N. Jersey Media Grp. Inc.,* 201 N.J. 500, 523 (2010).

A court must consider a statement as a whole to determine the impression it will make on a reader. *Kenny,* 205 N.J. at 294; *Decker v. Princeton Packet, Inc.,* 116 N.J. 418, 561 A.2d 1122, 1125 (1989) (explaining that "allegedly defamatory statement must be taken in context and the publication considered as a whole"). It also "must evaluate the criticized language according to the fair and natural meaning which it would be given by persons of ordinary intelligence." *Decker,* 116 N.J. 418, 425 (internal quotation and citation omitted); *Salzano,* 201 N.J. 500, 523.

The tort of false light "involves 'publicity that unreasonably places the other in a false light before the public." *Leang,* 198 N.J. at 588 (quoting *Romaine v. Kallinger,* 109 N.J. 282, 294 (1988)). "The tort of false light has two elements: (1) 'the false light in which the other was placed would be highly offensive to a reasonable person'; and (2) 'the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.'" *Id.* at 589 (quoting *Romaine,* 109 N.J. at 294); *see Andros v. Gross,* 2005 U.S. Dist. LEXIS 3545, at *34 (D.N.J. Dec. 21, 2005) (stating that one of the requirements of a false light claim "is, obviously, falsity"). "'Reckless disregard' is defined as a high degree of probable falsity, for

67

proof of which plaintiff must present sufficient evidence to permit the conclusion that defendant in fact entertained serious doubts as to the truth of the statements." *Hudak v. Fox*, 215 N.J. Super. 233, 235 (App. Div. 1985) (internal quotation marks and citations omitted).[37]

The Court will grant summary judgment and dismiss Profeta's claims of defamation, slander, false light, and trade libel for failure to establish an actionable false statement. *See Molin v. Trentonian*, 297 N.J. Super. 153, 155, 159 (App. Div. 1997) (affirming grant of summary judgment to local newspaper that published article about plaintiff's arrest for stalking because "[n]either the article nor headline, read in context," were false). The full context of the article is fairly understood as reciting Read's allegations and his claims. Essentially the statements in the article are sourced, and the article clearly conveys that it

---

[37]    Trade libel seems to be the form of defamation least applicable here. Trade libel is a "tort addressing aspersions cast upon one's business operation. The tort is also known as injurious falsehood, disparagement of property, or commercial disparagement." *Patel v. Soriano*, 369 N.J. Super. 192, 246 (App. Div. 2004). "To prove a claim of trade libel under New Jersey law, a plaintiff 'must demonstrate 1) publication 2) with malice 3) of false allegations concerning its property, product or business, and 4) special damages, i.e., pecuniary harm.'" *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 47 F. Supp. 2d 523, 538 (D.N.J. 1999) (quoting *Juliano v. ITT Corp.*, 1991 WL 10023, *4 (D.N.J. Jan. 22, 1991)); *see Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004). A plaintiff alleging trade libel "must demonstrate that Defendant's statements were false or that they were written with reckless disregard for the truth or falsity." *Mayflower Transit, LLC*, 314 F. Supp. 2d at 378.

Trade libel typically applies "to statements that are injurious to plaintiff's business, but cast no reflection on either plaintiff's person or property." *Patel v. Soriano*, 369 N.J. Super. at 245-46. In other words, trade libel only goes to comments regarding an actual product or service of a company. *Id.* at 257 ("If . . . the aspersion reflects only on the quality of plaintiff's product, or on the character of plaintiff's business as such, it is disparagement."). In contrast, statements that "attack the personal character of its owner as vendor" are in actuality defamation. *Id.* (quoting Restatement (Second) of Torts § 626 cmt. d (1977)). That Profeta allegedly "stole" Read's idea is at most a disparagement of Profeta, not his product, *i.e.*, the magazine. It is therefore unclear to the Court how trade libel would apply. *Cf. id.* ("if the statement charges plaintiff with personal misconduct, or imputes to plaintiff reprehensible personal characteristics, it is regarded as libel or slander.").

is reporting the allegations in a complaint, not reporting as a fact that Profeta "stole" Read's idea.[38]

All of that aside, many of the actual underlying facts here are not disputed. The notion that an idea was "stolen" is more of a legal conclusion or an opinion-based characterization of the facts, rather than a statement of fact that itself could be verified or disproved. *See Ward v. Zelikovsky*, 136 N.J. 516, 530 (1994) (recognizing distinction between "actionable defamatory statements" that are capable of verification, and "non-defamatory name-calling," including "rhetorical hyperbole" and "statements that are in form statements of opinion .

---

[38] There is an additional problem. It is alleged that Read "planted" the article in the *Star-Ledger* by means of his friend, a reporter. Profeta's claim is not asserted against the *Star-Ledger,* which could not be liable for reporting that a civil action had been filed and accurately summarizing the allegations. *See Salzano v. N. Jersey Media Grp. Inc.*, 201 N.J. 500, 513, 521-22 (2010) (applying fair-reporting privilege to article written about bankruptcy complaint, and recognizing that fair report privilege extends to "[a] full, fair, and accurate report regarding a public document that marks the commencement of a judicial proceeding," including a civil complaint), *cert. denied*, 562 U.S. 1200, 131 S. Ct. 1045 (2011); *see also Petro-Lubricant Testing Labs., Inc. v. Adelman*, 233 N.J. 236, 261 (2018) (applying fair-report privilege to article that reported on civil complaint that "essentially recounted the allegations set forth in [the] complaint."). Nor could Read himself be liable for statements made in a civil complaint, which enjoy a privilege. *See Giles v. Phelan, Hallinan 86 Schmieg, L.L.P.*, 901 F. Supp. 2d 509, 523 (D.N.J. 2012) (recognizing that New Jersey's litigation privilege "ensures that [s]tatements by attorneys, parties and their representatives made in the course of judicial or quasi-judicial proceedings are absolutely privileged and immune from liability."). The claim, then, boils down to one that Read is liable for "planting" a non-defamatory article that reported the contents of a non-defamatory complaint.

Read also argues that the one-year statute of limitations on defamation claims bars Profeta's defamation claim because the article was published on April 15, 2015, and Profeta's counterclaim was not filed until June 21, 2016. Read has raised this statute of limitations defense for the first time in this motion. *See* Fed. R. Civ. P. 8 (c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . statute of limitations"); *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133, 128 S. Ct. 750, 753 (2008) ("[T]he law typically treats a limitations defense as an affirmative defense that [must be] raise[d] at the pleadings stage and that is subject to rules of forfeiture and waiver."); *Robinson v. Johnson*, 313 F.3d 128, 134 (3d Cir. 2002) ("[P]arties should generally assert affirmative defenses early in litigation, so they may be ruled upon, prejudice may be avoided, and judicial resources may be conserved.").

. . which cannot reasonably be understood to be meant literally and seriously." (citing Restatement (Second) of Torts, § 566 cmt. e (1979)).[39]

Accordingly, Read's motion for summary judgment on Profeta's defamation, slander, false light, and trade libel is granted.

### C. Tortious Interference Claims

The remaining two allegations in Profeta's counterclaim assert tortious interference with prospective economic advantage, and tortious interference with contractual relations.

The law regarding tortious interference with a prospective economic advantage was outlined above. *See* section III.H, *supra*. Similar standards govern claims of tortious interference with contractual relations. *See Florian Greenhouse, Inc*, 11 F. Supp. 2d at 525; *see also Angrisani v. Capital Access Network, Inc.*, 175 F. App'x 554, 557 (3d Cir. 2006) ("Under New Jersey law, a claim of tortious interference requires a showing of (1) intentional and malicious interference (without justification); (2) with a prospective or existing economic or contractual relationship with a third party; (3) causing the loss of prospective gain; and (4) damages.").

Profeta has not established a loss of a prospective economic advantage or contract due to Read's allegedly tortious conduct. The only proffered evidence of a prospective economic advantage or contract was contained in paragraphs 8 and 9 of Profeta's belated declaration, which the Court has struck. (Profeta Decl. ¶¶8-9); *see Avaya Inc., RP*, 838 F.3d at 412 (affirming grant of summary judgment in favor of defendant on tortious interference claim where plaintiff failed to point to "one specific example where it has credible evidence that [defendant's] allegedly tortious conduct harmed its business."). And even those

---

[39] I observe in passing that the sentiment "I had the idea first" is one frequently expressed. It would ordinarily be regarded as a boast of priority, and would not necessarily or usually be taken to mean that the person is an actual lawbreaker or thief.

paragraphs failed to establish with reasonable concreteness that Read's statements caused *Radius* to lose advertisers and ultimately fail. [40]

Accordingly, Profeta's tortious interference claims are dismissed for failure to establish causation and damages.

## V. Conclusion

For the reasons expressed above, the motion of the remaining defendants, Profeta and *Radius,* for summary judgment on all of Read's claims is granted (DE 64). Read's motion to strike and for sanctions is granted in part and denied in part. (DE 72). Read's motion for summary judgment on defendants' counterclaims is also granted. (DE 65).

An appropriate order follows. The clerk shall close the file.

Dated: May 29, 2019

**KEVIN MCNULTY**
**United States District Judge**

---

[40]    As noted above, Profeta's claim that he lost business due to Read's conduct, equivocal in any event, rested on double hearsay (Profeta Decl. ¶ 8 ("I heard from the marketing people with several of Radius' advertisers that the executives in the companies were extremely disappointed with me for "stealing" Read's idea and they were not sure that they wanted to continue supporting my operation.")).

The only allegations that facially relate to actual damages rest on facts alleged in the struck paragraph 9. (Profeta Decl. ¶9 ("The following companies discontinued purchasing advertising from Radius: [The list is quoted at pp. 60–61, *supra*.] . . . . Prior to Read's statements, each of these advertisers had been purchasing advertising of $4,000 per quarter.")). Profeta's declaration artfully avoids actually stating that those advertisers cancelled because of Read's statements, however. Profeta merely states that some advertisers expressed disappointment in him for "stealing" the idea, and then separately lists advertisers who stopped purchasing ads at some point.

71